SAWICKI ET AL., APPELLEES, *v.* VILLAGE OF OTTAWA HILLS, APPELLANT; CITY OF TOLEDO, APPELLEE.

[Cite as Sawicki *v.* Ottawa Hills (1988), 37 Ohio St. 3d 222.]

(No. 87-213—Submitted January 12, 1988—Decided June 29, 1988.)

*Connelly, Soutar & Jackson, William M. Connelly, Steven P. Collier* and *Kevin E. Joyce,* for appellees Marsha Ann Sawicki and Leslie Ann Sawicki.

*Manahan, Pietrykowski, Bamman & Delaney, John A. Pietrykowski* and *Gerald R. Kowalski,* for appellant.

*Sheldon M. Rosen,* director of law, and *Robert G. Young,* for appellee city of Toledo.

*Calfee, Halter & Griswold* and *John E. Gotherman,* urging reversal for *amicus curiae,* Ohio Municipal League.

HOLMES, J. In the case *sub judice* the trial court instructed the jury upon ordinary negligence principles as well as those of the public duty-special duty theories of liability. As a matter of law, neither legal theory suffices to establish appellant's liability under the circumstances within the record before us. Accordingly, and for the reasons which follow, we reverse the determinations of the courts below.

I

The current law as expressed in R.C. 2744.01(C)(2)(a) and 2744.02(A)(1) appears to immunize municipal corporations from liability deriving from the actions of their police officers. However, the effective date of the statutes was November 20, 1985, which is well after the events which occurred in the case before us. More particularly, it should be observed that this case arose out of events which occurred during a time when this court had, in a series of divided opinions, judicially abrogated the application of the doctrine of sovereign immunity as a defense for municipal corporations. See, *e.g., Haverlack* v. *Portage Homes, Inc.* (1982), 2 Ohio St. 3d 26, 2 OBR 572, 442 N.E. 2d 749; *Enghauser Mfg. Co.* v. *Eriksson Engineering Ltd.* (1983), 6 Ohio St. 3d 31, 6 OBR 53, 451 N.E. 2d 228; *Strohofer* v. *Cincinnati* (1983), 6 Ohio St. 3d 118, 6 OBR 178, 451 N.E. 2d 787; *Longfellow* v. *Newark* (1985), 18 Ohio St. 3d 144, 18 OBR 203, 480 N.E. 2d 432; etc. Accordingly, the municipality of Ottawa Hills had no blanket immunity for its actions performed within the time frame delineated above.

As to the claim before us, the liability of Ottawa Hills is asserted to rest upon two failures: (1) that through dispatcher Wortman the village negligently failed to dispatch an Ottawa Hills police unit in response to Leslie Sawicki's pleas for help, (2) that dispatcher Wortman was negligent in communicating the exact circumstances which would indicate a life-threatening emergency to the Toledo Police Department; and that either or both of the above failures proximately caused the death of Peter Sawicki and all of appellees' damages.

In considering these claims, we begin by noting that even under *Haverlack, supra,* and its progeny, there was an expressed exception to the effect that no governmental entity could be made liable for "the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discre-

tion." *Marrek* v. *Cleveland Metroparks Bd. of Commrs.* (1984), 9 Ohio St. 3d 194, 9 OBR 508, 459 N.E. 2d 873, syllabus; *Mathis* v. *Cleveland Public Library* (1984), 9 Ohio St. 3d 199, 9 OBR 511, 459 N.E. 2d 877, syllabus; *O'Brien* v. *Egelhoff* (1984), 9 Ohio St. 3d 209, 9 OBR 520, 459 N.E. 2d 886. Consequently, as a general rule, under the law of such cases, a municipality cannot be found liable in negligence when its employees act, or refuse to act, so as to conform to a municipal ordinance and/or a state statute.

At the time of the events at issue, the law of Ohio specified in R.C. 2935.03 that police officers had no arrest powers, as police officers, when acting outside the boundaries of their political subdivisions, subject to narrowly tailored and inapplicable exceptions, such as "hot pursuit." R.C. 737.04 and 737.10 provided insurance coverage only to those municipal police officers who responded outside their jurisdiction pursuant to a Mutual Aid Pact.[3] Moreover, workers' compensation benefits were available only to police officers who acted within the scope of the above jurisdictional limitations.

On the municipal level, the village of Ottawa Hills had enacted Section 508 of the Rules and Regulations of the village of Ottawa Hills, which stated that no police officer was to respond to calls outside the jurisdiction except in

response to a call for aid essentially of the kind set forth in the Mutual Aid Pact. This policy was communicated to all police officers by way of written Section Orders.

The impact of the above laws and policies were well known to the two Ottawa Hills police officers on duty that night. One of the officers testified that shortly before the events at issue, a former Ottawa Hills police officer, who had been shot, was denied workers' compensation benefits because he had been standing a few feet beyond the Ottawa Hills jurisdictional boundaries when he was shot. Consequently, Officer David Schultz, who was the senior officer on duty when Leslie Sawicki telephoned Ottawa Hills and whose authorization was required in order to send help in a particular situation, testified that under no circumstances would he have allowed dispatcher Wortman to authorize a response outside the jurisdiction without an express request from the command officer of the Toledo Police Department.[4]

It is therefore clear that the law of Ohio and of Ottawa Hills generally precluded the response which appellees assert should have been made, *i.e.*, to send a nearby Ottawa Hills police unit in response to Leslie Sawicki's telephone call. Accordingly, dispatcher Wortman was under no initial obligation to provide police in-

---

[3] A Mutual Aid Pact is, in essence, an agreement between contiguous municipalities. It requires that, under specified circumstances, one municipality may request and receive aid from an adjoining municipality. It allows a municipality's police officer to respond to an out-of-jurisdiction request for aid, when the request is made by a command officer of the adjoining municipality.

[4] Finally, following the well-publicized events of this case, twenty-two local police

chiefs met and thereafter requested that their municipalities empower them to respond outside their jurisdictional limits in cases of life-threatening emergencies. All the municipalities passed such ordinances including the city of Toledo and the village of Ottawa Hills. State laws were also enacted to provide for insurance and other protections to police officers who responded outside their jurisdictions for life-threatening emergencies. See R.C. 505.41, 505.43, 505.61, and amended R.C. 737.041.

tervention, and any Ottawa Hills officer who responded would have done so with only the authority and the insurance protection of an ordinary citizen. Thus, no liability can attach for the mere decision not to send Ottawa Hills police units in response to requests for help outside the village's jurisdiction.

Appellees asserted at trial that, despite the legal prohibitions of extrajurisdictional responses contained in the above law, the village police department nevertheless had a practice of informally responding under certain circumstances to other jurisdictions' requests for help. The record of the trial does not support this allegation, but it should be noted that even if such a practice were demonstrated, it would equate legally to the mere voluntary assumption of a duty, which the village need not have assumed in all cases. Crucial to an appropriate analysis is the fact that the Ohio statutes rendered out-of-jurisdiction police responders virtually powerless to arrest, except under very narrow circumstances, and left them without the protections of their insurance policies or workers' compensation. This cannot equate to a duty to respond which will support an action in negligence. Appellees' claim is therefore reduced to whether or not the dispatcher voluntarily assumed a duty by his verbal conduct during the telephone conversations with Leslie Sawicki.

Appellees argued at trial that the dispatcher's response of "OK" to Leslie Sawicki's request that he send help constituted a voluntary assumption of a duty to send the help promised, and that because he failed to correctly communicate such details of the situation as would classify it as a "life-threatening emergency" to either the senior ranking Ottawa Hills police officer on duty or to the Toledo Police Department, then the police response was tardy and was the proximate cause of appellees' injuries.[5] To this end, appellees presented expert testimony which, on the surface, would appear to present an issue for jury determination. Upon closer examination, however, it becomes evident that the elements of the stated cause of action were indeed not met.

We are in accord with the trial court's jury instructions to the effect that once a duty is undertaken voluntarily, it must be performed with ordinary care. Prosser & Keeton, Law of Torts (1984) 380, Section 56; 2 Restatement of the Law 2d, Torts (1965) 139, Section 324; 70 Ohio Jurisprudence 3d (1986), Negligence, Section 15, at 56, and Section 21; 57 American Jurisprudence 2d (1971) 393, Negligence, Section 46. In the present case, for purposes of discussion, we shall assume that the dispatcher's answer of "OK" was such an assumption of a duty. However, that duty was limited precisely to performance of the act promised, i.e., to send help, since any alleged duties premised upon general statutory authorizations to perform certain acts are limited by the aforementioned state statutes, village ordinances and police department policies.

This plea for help transpired during the first of two calls which Leslie made to the Ottawa Hills Police Department. The dispatcher became aware in the interim between the first

---

[5] We do not decide the issue of whether the dispatcher's voluntary actions could legally bind the municipality since it is not necessary to the disposition of this case. We would point out, however, that any action which is forbidden by statute, ordinance, or policy would be outside his allowed discretion.

and second calls that he could not respond to an event occurring in the city of Toledo's jurisdiction, which he explained to Leslie during her second call. Consequently, the duty alleged must be that set forth in the first phone call alone. Barred as he was from dispatching an Ottawa Hills unit to the scene, the dispatcher exercised ordinary care by his prompt act of telephoning the Toledo Police Department and requesting that it send help for the victim of "a rape in progress." The question of whether Toledo's response time, less than seven minutes, was timely is a separate issue from whether the dispatcher procured help under a standard of ordinary care. Once he obtained the response from the Toledo Police Department that it would dispatch a unit to the scene, the Ottawa Hills dispatcher had then fully completed his voluntarily assumed duty to obtain help.

It is argued that his mistakes in describing details of Leslie's circumstances proximately created a delay in the Toledo Police Department's response to the scene. However, testimony was uncontradicted that by the time the actual dispatch occurred, the dispatcher had upgraded the response from one requiring high speed to one requiring high speed with emergency lights and siren.

Moreover, as a matter of law, a mere telephoned assumption of a duty to send help cannot be translated into the proximate cause of injury sustained from an armed criminal assailant already at the crime scene, since it is most distinguishable from assurances in the form of either a promise or duty to provide protection, which were not implicated in the present case. Appellees presume that the mere act of sending help was an equivalent to police protection which would have prevented the harms asserted. To ac-cept this view, we would be forced to accept, as a proximate cause issue, that by virtue of a timely arrival, the police would necessarily have been able to assert control over a situation where at least one firearm was present and where those involved were functioning with a high degree of emotional excitement. This we shall not do. Accordingly, we conclude that the argument that failure to timely respond was the equivalent of failure to protect appellees invited jury speculation, as opposed to factual determinations, upon the crucial issues of proximate cause.

Having determined the scope of the duty actually assumed by the Ottawa Hills dispatcher, we now determine the scope of justifiable reliance. The law of Ohio is clear that one who claims injury flowing from the violation of a duty must show that he expressly relied upon the performance of the duty assumed. Nowhere do appellees allege, nor could they, that Peter Sawicki personally relied upon words spoken to Leslie Sawicki by dispatcher Wortman in the first telephone conversation. Peter Sawicki was not then present or on his way to the scene. When informed by phone of the situation, he told his wife to call the Toledo Police Department, which expressed his reliance upon it and not Ottawa Hills. Thus, at no time did Peter Sawicki actually rely on any duty assumed by Ottawa Hills.

Appellees attempt to circumvent this analysis by their assertion that Peter Sawicki was a foreseeable rescuer who undertook peril to save his daughter and her boyfriend from the alleged dangerous condition created by the alleged dilatory police response. This is premised upon the legal theory that there is an independent duty of care owed to the rescuer. Prosser & Keeton, *supra,* at 308, Section 44. However, nowhere does the law im-

pose liability for injuries to a rescuer where the defendant did nothing to create the situation from which harm arose, whose only actions did nothing to worsen that situation, and where the harm was caused by activities over which the defendant had no power or responsibility. Prosser & Keeton, *supra,* at 491, Section 68; *Pennsylvania Co.* v. *Langendorf* (1891), 48 Ohio St. 316, 28 N.E. 172; Restatement of the Law 2d, Torts, *supra,* at Sections 433 and 448.

Appellees' argument miscomprehends the legal category occupied by both appellant and Peter Sawicki. As to dispatcher Wortman, it is clear beyond doubt that, absent any statutory obligations, the duty he is alleged to have voluntarily undertaken differs not at all from the duty alleged to have been voluntarily undertaken by Peter Sawicki. The dispatcher was therefore himself a rescuer who did not create the situation at issue but responded voluntarily to a plea for help. No rescuer owes any duty to other rescuers excepting, of course, that they should be accountable for their own acts of affirmative misconduct, Prosser & Keeton, *supra,* at Section 44.

As to Peter Sawicki, allegations that he was a rescuer founder upon the undisputed facts shown at trial. It is true that as he rushed from his home, the law may have considered him a rescuer; however, upon arrival at Todd Sabo's van, his conduct took on a different legal character. As set forth in the facts, Todd had the criminal actor under a significant, if not total, restraint in the van prior to Peter Sawicki's arrival. Upon his arrival, Peter Sawicki was quite upset and understandably expressed a desire to do physical harm to Anthony Cook. He thereafter initiated the actions previously set forth.

Thus, upon arrival, Sawicki did not act just as a rescuer, but as one seeking to retaliate against the restrained criminal actor. In order to do so, he completely altered the status quo which existed when he arrived. His actions at the scene constituted an intervening, superseding cause of the injuries which followed, which actions surely vitiated any of the alleged failures of the village of Ottawa Hills as a matter of law. See Restatement of the Law 2d, Torts, *supra,* at Section 472.

## II

Having considered this case in light of well-established negligence law, we also consider it in light of the legal theory commonly referred to as the public duty rule and its special duty exception. We do so not only because the trial court's instructions and interrogatories were partially based upon such theories but also because several courts of appeals in Ohio, including the court of appeals which considered the present case, have rendered decisions adopting the public duty doctrine. See *Mitchell* v. *Cleveland* (Jan. 15, 1987), Cuyahoga App. No. 51602, affirmed (1988), 37 Ohio St 3d 234, 525 N.E. 2d 483; *Zebrasky* v. *Dept. of Transportation* (1984), 16 Ohio App. 3d 481, 16 OBR 564, 477 N.E. 2d 218; *Cain* v. *State* (1985), 14 Ohio App. 3d 105, 14 OBR 119, 470 N.E. 2d 208; *Epling* v. *Cardarelli* (1983), 13 Ohio App. 3d 142, 13 OBR 175, 468 N.E. 2d 335; *Sawicki* v. *Ottawa Hills* (Dec. 12, 1986), Lucas App. Nos. L-85-366, L-85-443 and L-86-002, unreported; see, also, *Texaus Investment Corp.* v. *Haendiges* (C.A. 6, 1975), 761 F. 2d 252, which found such a duty within the law of Ohio.

The public duty rule originated at English common law and was particularly applied to the office of sheriff.

Although not the first American court to comment on the rule, the United States Supreme Court rendered the most significant early decision on the subject in the often quoted case of *South* v. *Maryland* (1855), 59 U.S. 396. Therein, Sheriff South was sued upon his official bond by one who had applied to him for protection, but was subsequently abducted and held for ransom. More specifically, plaintiff alleged that "the sheriff did not well and truly execute and perform the duties required of him by the laws of said State," thus giving rise to a cause of action.

The court pointed out that "[i]t is an undisputed principle of the common law, that for a breach of a *public duty,* an officer * * * is amenable to the public, and punishable by indictment only.

"The history of the law for centuries proves this to be the case. * * * [N]o instance can be found where a civil action has been sustained against him for his default or misbehavior as conservator of the peace, by those who have suffered injury to their property or persons through the violence of * * * [intervening criminal conduct]." *Id.* at 403, citing *Entick* v. *Carrington* (1765), 19 State Trials 1030, 1062 (opinion per Lord Camden).

The court also asserted an exception to the above rule. Relying upon *Ashby* v. *White* (1703), 2 Lord Raym. 938, 92 Eng. Rep. 126, the court concluded that an exception may be found where there exists a *"special individual* right, privilege, or franchise in the plaintiff, from the enjoyment of which he has been restrained or hindered by the malicious act of the sheriff." (Emphasis added.) *South* v. *Maryland, supra,* at 403.

More specifically, it has been stated that: "* * * [I]f the duty which the * * * [law] imposes upon * * * [a public official] is a duty to the public, [then] a failure to perform it, or an inadequate or erroneous performance, must be a public, not an individual injury, and must be redressed, if at all, in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it, or to perform it properly, is an individual wrong, and may support an individual action for damages." 2 Cooley, Law of Torts (4 Ed. 1932) 385-386, Section 300.

Although this court has had no occasion to expressly comment upon the public duty doctrine, the underlying principle that no more than a general duty to the public was intended by the General Assembly's empowering legislation has been established for some time. See *Western College of Homeopathic Medicine* v. *Cleveland* (1861), 12 Ohio St. 375, 380; *Reckman* v. *Keiter* (1959), 109 Ohio App. 81, 10 O.O. 2d 252, 164 N.E. 2d 448. Further, this doctrine has been obscured by, yet was coexistent at common law with, the doctrine of sovereign immunity. Rather than being an absolute defense, as was sovereign immunity, the public duty rule comported with the principles of negligence, and was applicable to the determination of the extent to which a statute may encompass the duty upon which negligence is premised. If a special relationship is demonstrated, then a duty is established, and inquiry will continue into the remaining negligence elements. See, *e.g., Florence* v. *Goldberg* (1978), 44 N.Y. 2d 189, 404 N.Y. Supp. 2d 583, 375 N.E. 2d 763; *Massengill* v. *Yuma County* (1969), 104 Ariz. 518, 456 P. 2d 376; *Morgan* v. *District of Columbia* (D.C. App. 1983), 468 A. 2d 1306. It can therefore be concluded that the public duty rule is an independent doctrine and, consequently, survives the abrogation of sovereign immunity.

Various public policy rationales have been set forth to justify the public duty doctrine. One of the basic policy considerations has been that of finance. It is most often asserted that because the available public resources are limited by the resources possessed by the community, the deployment of them must remain in the realm of policy decision. Obviously, there are insufficient police resources to meet every need, particularly in high crime areas and during times of higher crime rates. Police departments must be able to prioritize and create responses without the benefit of hindsight.

For this and other reasons, the public duty rule has become the majority rule among the state jurisdictions. See, *e.g.,* Annotation, Liability of Municipality or Other Governmental Unit for Failure to Provide Police Protection (1972), 46 A.L.R. 3d 1084, 1088; Annotation, Governmental Tort Liability for Failure to Provide Police Protection to Specifically Threatened Crime Victim (1986), 46 A.L.R. 4th 948, 950. Prosser & Keeton, *supra,* states at 1049-1050: "[A] failure to provide police protection, like the failure to provide fire protection, is usually immune, either on the ground that the decision to deny such protection is a discretionary or basic policy decision or on the ground that the duty to protect is owed to the public at large and not to any particular person who might be injured * * *. [T]he overwhelming current of decisions continues to reject liability based upon a general failure to provide police protection * * *." See, also, Restatement of the Law 2d, Torts, *supra,* at 119, Section 314A; Annotation, Liability for Failure of Police Response to Emergency Call (1985), 39 A.L.R. 4th 691; *Turner* v. *United States* (1919), 248 U.S. 354; the cases collected in *Sawicki* v. *Ottawa Hills* (Dec. 12, 1986), Lucas App. Nos. L-85-366, L-85-443 and L-86-002, dissent of Resnick, J., at fn. 1; and Note, Police Liability for Negligent Failure to Prevent a Crime (1981), 94 Harv. L. Rev. 821.

A perusal of the law of other state jurisdictions reveals that the courts of New York have had considerable experience in applying both the public duty rule and its special duty exception. See, *e.g., Shuster* v. *City of New York* (1958), 5 N.Y. 2d 75, 180 N.Y. Supp. 2d 265, 154 N.E. 2d 534; *DeLong* v. *County of Erie* (1982), 89 App. Div. 2d 376, 455 N.Y. Supp. 2d 887, motion to dismiss appeals denied (1983), 58 N.Y. 2d 860, 460 N.Y. Supp. 2d 526, 447 N.E. 2d 74, decision affirmed (1983), 60 N.Y. 2d 296, 469 N.Y. Supp. 2d 611, 457 N.E. 2d 717; *Sorichetti* v. *City of New York* (1985), 65 N.Y. 2d 461, 492 N.Y. Supp. 2d 591, 482 N.E. 2d 70; *Cuffy* v. *City of New York* (1987), 69 N.Y. 2d 255, 513 N.Y. Supp. 2d 372, 505 N.E. 2d 937.

Particularly useful is the standard adopted in *Cuffy, supra,* which appears to be the most recent New York decision in the area of the law at issue. In reviewing the matter before it, the New York Court of Appeals reiterated its longstanding rule that "a municipality's duty to provide police protection is ordinarily one owed to the public at large and not to any particular individual or class of individuals." *Id.* at 260, 513 N.Y. Supp. 2d at 374, 505 N.E. 2d at 940. The court then considered whether the case before it was within the ambit of the "class of cases in which we have recognized an exception * * * based upon a 'special relationship' between the municipality and the claimant." *Id.* at 260, 513 N.Y. Supp. 2d at 375, 505 N.E. 2d at 940. In finding that no special relationship existed, the court set forth a test for the presence of a special relationship based

upon an analysis of the existence of four elements, as follows: "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." *Id.* See, also, *Sorichetti, supra,* at 469, 492 N.Y. Supp. 2d at 596, 482 N.E. 2d at 75. We now adopt these principles for application to cases in Ohio wherein a special duty is alleged.

In considering the case before us, the claim by the estate of Peter Sawicki fails for several reasons. First, as set forth in the previous analysis, the Ottawa Hills Police Department was under no statutory obligation and, in fact, was legislatively forbidden to answer such calls for assistance originating beyond its jurisdictional boundaries. Consequently, there was no statutory duty upon which to apply the public duty doctrine. It would be an unreasonable presumption to allow the special relationship exception to the public duty rule to function apart from a duty premised upon a general empowering statute. Thus, a special duty exception cannot be an independent basis for liability when the plaintiffs' sole allegation of a duty can only be premised upon the voluntary assumption of a duty.

Also, even allowing an application of the special duty analysis to the facts of this case, the claim would fall far short. As previously demonstrated, the decedent had made *no* reliance, justifiable or otherwise, upon the Ottawa Hills Police Department. He indisputably was aware of the jurisdictional limitations of Ottawa Hills and expressly relied upon a response from the Toledo Police Department. Accordingly, appellees have not demonstrated the existence of the fourth element for proving the existence of a special relationship.

As to the first element, it cannot be reasonably asserted that the village assumed an affirmative duty to act on behalf of Peter Sawicki. It made no promise to him or concerning him. Finally, there was no direct contact between Peter Sawicki and the police dispatcher, as required in the third element. At the time of Leslie Sawicki's first phone call, Peter was neither involved in the events at issue nor contemplated as an immediately involved family member for whose protection the call was made. Accordingly, the required elements being absent from the facts before us, the claim of Peter Sawicki's estate under the special relationship exception to the public duty rule could not be maintained.

The claims of Leslie Sawicki likewise fail under the facts presented. Obviously those parts of her claim based upon the demise of Peter Sawicki fail for the same reasons as those claimed by his estate. As with such claims, there was no statutory obligation involved and consequently no proper invocation of the public duty doctrine. Moreover, the duty voluntarily assumed was, as a matter of law, performed under the requisite standard of ordinary care. However, implicit within her claim and the proceedings below is the assumption that a special relationship may be created by a telephoned request for assistance. We could hardly conclude an analysis of the creation of a special relationship within the present facts without considering the effect under the public duty doctrine of Leslie Sawicki's telephone call.

We hold that a telephone conversa-

tion between a member of the general public and a police department, wherein the caller requests help and the police operator says he will send help, is insufficient as a matter of law to establish a special relationship between the caller and the police. This is because a mere telephoned call for assistance does not sufficiently remove the caller from the class of the general population. Regardless of the police dispatcher's response, it does not represent a commitment of *particular* police resources to that individual. A special duty to protect each and every member of the public who calls for assistance is, quite simply, not any different than a police department's general statutory obligations. Also, to hold otherwise would allow any member of the general public to unilaterally call into existence this special relationship and thereby direct the discretion of police command officers. See *Morgan* v. *District of Columbia, supra,* at 1313; *Haehl* v. *Port Chester* (S.D. N.Y. 1978), 463 F. Supp. 845, 851. Finally, as previously mentioned, the inherently prioritized assumption of an obligation to send help cannot be transmuted into a promise of protection which the police are not then in a physical proximity to provide.

Accordingly, we reverse the judgment of the court of appeals, noting that the issue of appellant's third-party complaint is now moot, and remand the cause to the trial court for proceedings not inconsistent herewith.

*Judgment reversed.*

MOYER, C.J., LOCHER and WRIGHT, JJ., concur.

SWEENEY and H. BROWN, JJ., concur in judgment only.

DOUGLAS, J., not participating.