SEMADENI, EXR., APPELLANT, *v.* OHIO DEPARTMENT OF TRANSPORTATION, APPELLEE.

[Cite as *Semadeni v. Ohio Dept. of Transp.* (1996), 75 Ohio St.3d 128.]

(No. 94–2356—Submitted December 13, 1995—Decided March 4, 1996.)

130

*Dinsmore & Shohl, Mark A. Vander Laan, Joel S. Taylor* and *David K. Mullen,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Teri Jo Finfrock,* Assistant Attorney General, for appellee.

MOYER, C.J.   In 1975 the state of Ohio enacted R.C. 2743.02, which provides, with certain exceptions not relevant herein, that "[t]he state hereby waives its immunity from liability and consents to be sued, and have its liability determined, * * * in accordance with the same rules of law applicable to suits between private parties * * *."   R.C. 2743.02(A)(1).

We have previously recognized that imposition of tort liability upon a private bridge contractor may be justified when damage is caused by third parties who have dropped objects from bridges under the contractor's control.   In *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.* (1989), 45 Ohio St.3d 171, 543 N.E.2d 769, the plaintiff alleged negligence on the part of a private bridge contractor in failing to adopt adequate measures to prevent the dropping of objects from a bridge it was repairing, and which had been the site of similar past incidents.   The vandalism caused damage to the property of the plaintiff located below the bridge.   We concluded that the trial court erred in directing a verdict in favor of the bridge contractor, holding in the syllabus that "[i]f a person exercises control over real or personal property and such person is aware that the property is subject to repeated third-party vandalism, causing injury to or affecting parties off the controller's premises, then a special duty may arise, to those parties whose injuries are reasonably foreseeable, to take adequate measures under the circumstances to prevent future vandalism."

We find *Ruhlin* to be factually analogous to the case at bar.   In light of ODOT's adoption of Policy 1005.1, and applying "the same rules of law applicable to suits between private parties" to the facts before us, we conclude that ODOT possessed a duty to foreseeable travelers such as Semadeni to take adequate measures to timely implement Policy 1005.1.   The Court of Claims, however,

accepted the state's contentions that ODOT was immune from liability for Semadeni's death pursuant to *Reynolds v. State* (1984), 14 Ohio St.3d 68, 14 OBR 506, 471 N.E.2d 776, and its progeny, *e.g., Garland v. Ohio Dept. of Transp.* (1990), 48 Ohio St.3d 10, 548 N.E.2d 233; *Anderson v. Ohio Dept. of Ins.* (1991), 58 Ohio St.3d 215, 569 N.E.2d 1042.

In *Reynolds* we held that the state's consent to be sued pursuant to R.C. 2743.02 in accordance with the rules of law applicable to suits between private parties preserved the state's immunity "for its legislative or judicial functions, or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Id.* at paragraph one of the syllabus. Those functions are not engaged in by private parties. We recognized, however, that once such a basic policy decision has been made, and the state has determined to engage in a certain activity or function, "the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities." *Id.*

In *Garland* we reaffirmed *Reynolds* and further held that "[o]nce a governmental entity has made a discretionary decision, it has a reasonable amount of time to implement that decision without incurring tort liability." *Id.* at paragraph two of the syllabus.

In *Anderson* we held in paragraph one of the syllabus that "[w]hen carrying out the mandates of a public employer, the actions of the agents or employees of that employer are distinguishable from the original decision to take action and thus could be actionable." We there rejected the state's argument that decisions as to the *manner* in which a basic policy decision is implemented fall within the scope of the state's reserved sovereign immunity, even if implementation decisions require state employees to exercise some degree of discretion. *Anderson,* 58 Ohio St.3d at 217–218, 569 N.E.2d at 1044–1045.

Applying this precedent we find that adoption of Policy 1005.1 in 1985 was a "basic policy decision," and that ODOT failed to implement Policy 1005.1 within a reasonable amount of time. The Court of Claims erred in its legal conclusion that subsequent "time and manner" decisions made to implement Policy 1005.1 were themselves entitled to immunity.

When it adopted Policy 1005.1, ODOT determined that the installation of protective fencing was mandatory for all existing bridges in Ohio which scored ten index points or more according to criteria established within the policy, unless "adequate justification for not doing so [could] be furnished." The policy became effective in July 1985 when it received federal approval. The evidence was uncontroverted that the Blair Avenue overpass at all relevant times justified a score in excess of ten points. However, on the date of Semadeni's accident,

nearly five years later, no fencing had yet been installed on the Blair Avenue bridge.

It is clear that ODOT recognized dangers to the traveling public as early as May 1985 when it transmitted Policy 1005.1 to the Federal Highway Administration for approval, and that ODOT was aware in 1985 and 1986 that incidents of debris being dropped from freeway bridges were occurring throughout the state. As early as December 1986, ODOT's chief engineer characterized the dropping of objects from bridges onto interstates as a "very real problem." ODOT was informed in November 1986 that the city of Cincinnati had received "numerous complaints from citizens and police concerning objects being thrown from overpasses onto the Interstate Highways below." In 1986, ODOT officials acknowledged Cincinnati's concern that fencing on its interstate bridges be implemented quickly. At least as early as January 1988 ODOT was aware of the Akron incident in which two women had been raped and murdered in connection with a dropped object incident.

The record discloses, however, no attempt on the part of ODOT to implement Policy 1005.1 for over a year from the date the policy became effective in 1985. ODOT failed to even notify its district deputy directors located throughout the state of the adoption of Policy 1005.1 until August 12, 1986. Despite clear expressions of concern by both Cincinnati and ODOT officials about the problem of dropped objects, it was not until January 1988, well over two years from the time Policy 1005.1 was adopted and approved, that ODOT established funding for any protective fencing anywhere in the state. Even then, the program established funding for only ten percent of the qualifying bridges in Ohio. The Blair Avenue overpass was one of more than four hundred bridges scoring ten index points or more which were not approved for funding.

The Blair Avenue bridge justified a score of twelve index points by ODOT's own criteria, and pursuant to Policy 1005.1, ODOT's agents and employees were under a mandatory duty to complete its fencing within a reasonable time. In a nearly five-year period, ODOT fenced only a small minority of the bridges which it had itself deemed to be in mandatory need of fencing, including the Blair Avenue overpass. Failure to timely implement Policy 1005.1 as to bridges highest in priority undoubtedly resulted in even greater delay in fencing bridges further down the list of priority, such as the Blair Avenue bridge.

We hold that, pursuant to R.C. 2743.02, ODOT is not immune from plaintiff's claims of liability. We conclude on this record that reasonable minds could only find that ODOT was negligent in failing to timely implement Policy 1005.1, and that its negligence was a proximate cause of Pietro Semadeni's death. We

therefore remand this cause to the Court of Claims for it to determine the amount of damages to be awarded Semadeni's estate.

*Judgment reversed*
*and cause remanded.*

RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS, J., concurs in judgment only.

WRIGHT and COOK, JJ., dissent.

COOK, J., dissenting. I respectfully dissent from the majority decision because I would find that ODOT is not liable.

A state is immune for "the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Reynolds v. State* (1984), 14 Ohio St.3d 68, 14 OBR 506, 471 N.E.2d 776, paragraph one of the syllabus. Once such a discretionary decision is made, however, the agency must implement its decision within a "reasonable amount of time" or it may be subject to tort liability. *Garland v. Ohio Dept. of Transp.* (1990), 48 Ohio St.3d 10, 548 N.E.2d 233, paragraph two of the syllabus.

In *Garland,* we extended the state's immunity beyond the discretionary decision to install a traffic light at a busy intersection to the decision regarding the type of traffic signal to install. *Id.* at paragraph one of the syllabus. The court recognized that discretionary decision-making also included the timing of an installation and decisions as to funding the installation of the traffic light.

As in *Garland,* ODOT's decision-making process in this case extended from the decision to install protective fences statewide, to the determination of which bridges needed to be fenced, when they needed to be fenced and how the project would be funded. ODOT's decisions required ODOT not only to prioritize the protective fence program but also to coordinate the fence project with other highway safety projects, such as road resurfacing, traffic signals, intersection improvements, bridge replacements and new highway construction. Making these decisions was part of the executive planning stages of Policy 1005.1, for which ODOT was immune from liability.

Without the benefit of expert testimony on the magnitude of ODOT's undertaking of this as well as other ODOT projects at the relevant time and without following or adopting any defined standard of "reasonableness," the majority determines that ODOT was negligent in implementing its policy and subject to liability. The majority measures the reasonableness of ODOT's actions from July 1985, when the policy received Federal Highway Administration approval and concludes that the time from federal approval until the accident was an unreason-

able period in which to implement Policy 1005.1. However, in January 1988, ODOT made its final discretionary decision—the initial funding for forty-four bridges. From that time ODOT was subject to liability if it did not implement the policy within a reasonable period.

In *Garland,* this court determined that fourteen months was a reasonable period of time to implement the installation of a single traffic light at a single intersection. 48 Ohio St.3d at 12, 548 N.E.2d at 235. Here, unlike in *Garland,* ODOT sought to install protective fencing on hundreds of bridges throughout the state. The undertaking involved multiple steps, several districts, millions of dollars, and numerous decisions which could, and did, take several years. Semadeni's accident occurred roughly two years after the initial funding decision. If fourteen months has been found to be a reasonable time, as a matter of law, to implement the installation of a single traffic light, then two years should be a reasonable period of time in which to implement a policy to fence more than four hundred bridges across the state at a cost of $26 million.

Even if ODOT did not implement its policy decision within a reasonable amount of time, there is a further legal step before the state may be found liable. A state is not subject to tort liability unless the state or agency owed a special duty to plaintiff that is separate and distinct from the duty the agency owed to members of the general public. *Anderson v. Ohio Dept. of Ins.* (1991), 58 Ohio St.3d 215, 218, 569 N.E.2d 1042, 1045; *Sawicki v. Ottawa Hills* (1988), 37 Ohio St.3d 222, 525 N.E.2d 468. The majority does not consider whether ODOT had a special duty to Mr. Semadeni. If there is no special duty to Mr. Semadeni, then ODOT is not liable to him for breach of its duty to the general public.

Four elements must be proven in order to establish the existence of a special duty: (1) the state must assume an affirmative duty to act on behalf of the injured party; (2) the state must be aware that its inaction would lead to the alleged harm; (3) there must be direct contact between the state and the injured party; and (4) the injured party must justifiably rely upon the state's affirmatively undertaking its promised form of relief. *Anderson,* 58 Ohio St.3d at 219, 569 N.E.2d at 1045. Upon review of the record, I would find that ODOT owed a general duty to the public, rather than a special duty to Mr. Semadeni, to take measures to prevent vandalism on highway bridges.

The majority relies on *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.* (1989), 45 Ohio St.3d 171, 543 N.E.2d 769, to find that ODOT owed a special duty to Semadeni take adequate measures to prevent vandalism. In *Ruhlin* we held that a construction company, repairing a single bridge that had been the site of repeated vandalism, owed a special duty to the property owner located near the bridge. In contrast, ODOT was responsible for more than four hundred bridges that needed to be fenced. Furthermore, the majority does not cite any facts

which indicate that ODOT was aware that the Blair Avenue bridge was the subject of repeated vandalism. Rather, the majority relies on ODOT's knowledge that vandalism on bridges was a statewide problem; that Cincinnati considered vandalism from bridges a serious problem; and that a serious incident occurred in Akron as a result of bridge vandalism. None of these facts indicates that ODOT had notice that the Blair Avenue bridge was the subject of repeated vandalism.

For these reasons, I would find that ODOT was not subject to liability and would affirm the judgment of the court of appeals.

WRIGHT, J., concurs in the foregoing dissenting opinion.