OPINION
{¶ 1} Plaintiff-appellant, Claire M. Busam, on behalf of her deceased son, Joseph Busam, Jr., appeals from a judgment of the Ohio Court of Claims that found in favor of defendant-appellee, Ohio Department of Mental Retardation and Developmental Disabilities ("MRDD"), in this negligence action.
 {¶ 2} Joseph ("Joey") Busam, Jr., was born in 1951 with complications causing him to be mentally retarded. In 1967, Joey's family placed him in the Good Shepherd Manor ("GSM"), a home for retarded men in Wakefield, Ohio. Although GSM was a private facility operated by a Roman Catholic order of brothers, the "Brothers of the Good Shepherd" ("Brothers"), MRDD inspected and licensed GSM. Joey's family paid the entire cost of his residence at GSM, where Joey lived until his parents removed him in 1992 when he began to suffer serious health problems. After testing, the family learned Joey had contracted acquired immune deficiency syndrome ("AIDS"). Tragically, Joey succumbed to the disease in 1996.
 {¶ 3} In an effort to understand when and how Joey had contracted the disease, Joey's parents consulted with physicians, who estimated that Joey most likely had been infected sometime between 1977 and 1987. During this period of time, in the early 1980s, Fred Moore, another resident of the home, alleged at least one of the Brothers had sexually abused him. In 1985, after MRDD's investigation substantiated that allegation, and apparently turned up evidence of other incidents involving other residents and Brothers, the Diocese of Columbus removed the Brothers from the facility, changed its name, and appointed replacement staff. However, throughout the investigation, no information surfaced regarding any sexual abuse involving Joey.
 {¶ 4} Appellant initiated this action in the Court of Claims alleging that MRDD's negligence in investigating and addressing the problems at GSM proximately caused Joey's injury and death.[1] After a trial, the Court of Claims found for MRDD based upon its conclusion that MRDD had not been negligent in its handling of the yearly licensing process, nor in the 14-month investigation of sexual abuse allegations culminating in the removal of the Brothers from the home. The court's decision stated, in part:
In making this determination the court recognizes that, during the time period in question, there had not been the massive exposé of sexual abuse within the Catholic Church that has been the subject of so much wide-spread media attention in recent times. Plaintiff's reverence for the leaders of her church was not uncommon. Likewise, it would be fair to state that the public, in general, would have found it difficult to question the piety of the individuals alleged to have committed the flagrant abuses discovered in this case. Consequently, the court is mindful that, viewed from today's standpoint, there was more that could have been done by MRDD to protect the residents of GSM. However, the court is convinced by the evidence that MRDD did all that was required of it in light of the prevailing attitudes of the time surrounding the Catholic Church. Moreover, the court recognizes that the process was complicated by the difficulty of fairly assessing allegations made by individuals with diminished mental capacities such as the residents of GSM.
With respect to the conduct of [MRDD caseworker] Joanna Salem [n.k.a. Corfias], the court is persuaded by the evidence that she reasonably believed the occurrence of physical abuse was resolved when Brother John Thomas left GSM. * * *
With respect to [MRDD investigator] Bryan Porter's investigation, the court finds it significant that at no time was Joey ever mentioned as a victim. His family did not believe him to be the victim of any sexual abuse until almost seven years after Fred Moore made his allegations. And, while there was testimony that Joey told a GSM employee that The Brothers were hurting him, the evidence shows that the employee never revealed the information to Joey's family members, anyone at the facility, or to MRDD.
* * *
For the foregoing reasons, the court concludes that MRDD fulfilled any duty owed by it under the circumstances of this case. * * *
However, even assuming that plaintiff could establish a duty owed and breached, the court further finds that she could not prevail because the evidence does not support a finding that any breach of such duty was the proximate cause of Joey's illness and death. Specifically, the evidence shows that sexual activity was not uncommon at GSM between residents, between residents and visitors, and between residents and staff. * * * Thus, there is simply no persuasive evidence as to how, or by whom, Joey was abused and/or infected with HIV.
Busam v. Dept. of Mental Retardation and DevelopmentalDisabilities, Ct. of Cl. No. 2000-01660, 2004-Ohio-876, at ¶ 24-26, 32-33.
 {¶ 5} Appellant now asserts the following two assignments of error:
1. The trial court erred in finding [MRDD] fulfilled their duty to plaintiff.
2. The trial court erred in finding the [MRDD] breach was not the proximate cause of appellant's injuries.
 {¶ 6} Appellant's assignments of error are related and will be addressed together. At the outset, we note we may not reverse as against the manifest weight of the evidence judgments supported by some competent, credible evidence going to all essential elements of the case. C.E. Morris Co. v. Foley Constr.Co. (1978), 54 Ohio St.2d 279, syllabus.
 {¶ 7} This case involves allegations of state liability for the negligent inspection and licensing of a private facility, thus, Wallace v. Ohio Dept. of Commerce, Div. of State FireMarshal, 96 Ohio St.3d 266, 2002-Ohio-4210, controls its resolution. In Wallace, the court rejected the public-duty rule as incompatible with R.C. 2743.02, holding that, in negligence suits against the state, the Court of Claims must apply the same tort principles as would be applicable in suits between private parties. As a result, state liability will arise only where the injured plaintiff establishes duty, breach of duty, and proximate cause.
 {¶ 8} Moreover, in negligence actions that are based on failure to act or failure to control the conduct of a third person, the plaintiff must show that a special relationship existed between a state actor or agency and a private individual over whom the state had some duty of care or control. Id. at ¶ 38. In Sawicki v. Ottawa Hills (1988), 37 Ohio St.3d 222, paragraph four of the syllabus,[2] the court set forth the requisite elements of a "special duty or relationship":
* * * (1) [A]n assumption by the [governmental entity], through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the [governmental entity]'s agents that inaction could lead to harm; (3) some form of direct contact between the [governmental entity]'s agents and the injured party; and (4) that party's justifiable reliance on the [governmental entity]'s affirmative undertaking.
 {¶ 9} In analyzing whether appellant proved all of the elements of a negligence claim, and/or whether appellant's evidence established a special duty or relationship, the trial court identified MRDD's duty as deriving from statutes regulating and providing for the licensing of privately-owned facilities like GSM. Considering all of the evidence, however, the court concluded that MRDD had not breached its duty because MRDD staff members responded appropriately to allegations of abuse, despite receiving scant information from mentally-impaired informants.
 {¶ 10} Significantly, the court found, and our review of the record supports, that at no time during Joanna Salem Corfias' investigation of allegations of physical abuse by Brother John, nor during the 14-month investigation of resident Fred Moore's allegations of sexual abuse against Brother Finton Shaffer and others, did any resident or staff member reveal to MRDD that Joey was a victim of any kind of abuse. At trial, GSM staff member Geneva Mustard testified that Joey had told her of being sexually abused by Shaffer, but, although she encouraged Joey to tell his family about it, she never revealed the abuse to anyone during MRDD's investigation. Resident Fred Moore, whose letter revealing that the Brothers had "use[d] [him] for a girl" prompted Bryan Porter's investigation, testified that he saw Brother DeClan and Joey engaging in sexual contact, but that he did not tell anyone about it. Finally, Bryan Porter testified that despite the extensive time he spent investigating GSM, "peeling" away the layers of "an onion," as he called it, at no time did any of the staff or residents identify Joey as a victim of abuse. Joey's sister, Claire Corcoran, testified that, although in hindsight comments Joey had made to her in 1981 indicated he probably was being sexually abused then, he did not tell her the whole story until 1993, after he had already left GSM and been diagnosed with AIDS.
 {¶ 11} Appellant argues that, even without direct evidence that Joey was being sexually abused, as a retarded citizen Joey was a client of MRDD, and was owed a special duty. The trial court rejected this rationale, concluding that:
* * * MRDD did not have control over The Brothers' conduct, rather, it was responsible for licensing the facility, not for its operation. GSM was the custodian of Joey, not MRDD. In short, the court cannot conceive of how a special relationship duty could arise where MRDD's contacts with the facility it licensed was limited to three or four visits per year.
Busam at ¶ 31.
 {¶ 12} Finally, the court also found that appellant's evidence did not support a finding that any breach of duty by MRDD proximately caused Joey's injury. The court focused upon evidence that Dale Lamerson, a GSM employee after the time of the Brothers, died of AIDS, and that GSM CEO Normand Tremblay's testimony had referenced statements by resident Kevin Wietsma suggesting sexual contact between Joey and Lamerson. Thus, the court found there was "no persuasive evidence as to how, or by whom, Joey was abused and/or infected," and concluded that "[a]lthough Joey was exposed to a horrific state of affairs at GSM," only speculation can determine whether any act or omission by MRDD proximately caused his injury or death. Busam at ¶ 33-34.
 {¶ 13} After reviewing the transcript and record in this case, we agree with the trial court that there simply was no evidence linking any act or omission of MRDD to Joey's illness and death. Therefore, even if MRDD owed a duty to Joey, and even if MRDD breached that duty, appellant cannot show that a breach of duty by MRDD caused the alleged injury and, therefore, cannot recover against MRDD. What happened to Joey was tragic, and we sympathize with his family and share their outrage that members of the clergy and other trusted GSM staff cruelly exploited vulnerable individuals in their care. However, we do not find that MRDD's conduct in the matter proximately caused or contributed to Joey's death. Therefore, we must overrule appellant's assignments of error and affirm the judgment of the Ohio Court of Claims.
Judgment affirmed.
Lazarus and Sadler, JJ., concur.
[1] Some of the facts underlying this action are outlined in the Ohio Supreme Court's disposition of appellant's previous suit against the Brothers and the Diocese of Columbus. See Doe v.Shaffer (2000), 90 Ohio St.3d 388.
[2] Although Wallace abrogated the public duty rule, this aspect of Sawicki remains viable.