COLEMAN et al., Appellants,

v.

GREATER CLEVELAND REGIONAL TRANSIT AUTHORITY et al., Appellees.

[Cite as *Coleman v. Greater Cleveland Regional Transit Auth.*, 174 Ohio App.3d 735, 2008-Ohio-317.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 89413.

Decided Jan. 31, 2008.

Steven M. Weiss, for appellants.

Paul A. Janis, for appellees.

KENNETH A. ROCCO, Judge.

{¶ 1} Plaintiffs-appellants Diane Coleman, personally and on behalf of her minor son Brandon Coleman, and Enoch Al–Amin (collectively, "Coleman") appeal from the trial court order that granted summary judgment to defendant-appellee, the Greater Cleveland Regional Transit Authority ("RTA"), on their complaint.

{¶ 2} Coleman argues in her two assignments of error that summary judgment in RTA's favor was unwarranted on the record before the trial court. This court

agrees. Consequently, Coleman's assignments of error are sustained. The trial court's order is reversed, and this case is remanded for further proceedings.

{¶ 3} According to the record, on the night of September 12, 2005, Coleman left her work at the Cleveland Clinic Foundation in Cleveland, and, as was her habit, boarded the route number 6 RTA bus for home. Although the bus was crowded, she found a seat.

{¶ 4} A female co-worker, whom Coleman recognized but whose name she at that time did not know, also boarded. Coleman knew the woman lived near her, because she often took the same bus and exited at the same stop as Coleman. The woman found a seat directly across the aisle from Coleman. Coleman subsequently discovered that the co-worker's name was Frances Spencer.

{¶ 5} Spencer sat next to a man, later identified as Peter Farquharson, who occupied the window seat. Coleman had seen Spencer sit with Farquharson on previous occasions and had assumed the two knew each other.

{¶ 6} After a period of time, some of the other passengers alighted. Spencer and Farquharson took the opportunity to move into seats a few rows closer to the front of the bus. They otherwise retained their original seating arrangement. Coleman decided to do likewise. However, when she took a seat near the two, Spencer began to accuse her of stepping on Farquharson's feet.

{¶ 7} Coleman argued to the contrary, since Farquharson was sitting by the window. Her protests seemed merely to enrage Spencer; Spencer stood up and launched into a verbal attack of a personal nature. Farquharson, apparently emboldened by Spencer's tirade, joined in by cursing, calling Coleman "names, and threatening that he was going to do bodily harm" to her. He "lunged" from his seat toward her, "saying that he was going to cut" Coleman, but Spencer's position prevented Farquharson from actually reaching Coleman.

{¶ 8} Spencer at that point stated to Coleman, "I'm going to cut you up and down." While pushing him back into his seat, Spencer told Farquharson, "We are going to get her when we get off. * * * We are going to cut her up and down."

{¶ 9} Coleman, frightened by their behavior, attempted to use her cellular telephone, only to find that it wouldn't work. She then loudly called out to the bus driver, "Hey, they are back here threatening to cut me up. Call the police, or call 911, because they are threatening to cut me. He threatened to slit my throat." Spencer still stood, although the bus compartment no longer was crowded.

{¶ 10} According to Coleman, the bus driver stopped the bus to let a passenger alight. He simply looked at her in his mirror; otherwise, he gave no response. He continued driving.

{¶ 11} Spencer eventually returned to her seat, still holding Farquharson back, and still making menacing comments. When the bus finally came to their stop in East Cleveland, the two exited. Coleman stood up and reiterated her plea to the driver to call the police. Although she made eye contact with him in the bus mirror, she received no acknowledgment. Instead, "everybody" on the bus sat "in silence. Nobody [was] saying anything, not even him. He's just got the door open waiting for me to get off the bus." Spencer and Farquharson stood outside.

{¶ 12} From the driver's refusal to respond, Coleman believed she had no choice but to leave. She knew that her boyfriend, Al–Amin, and her 11–year–old son were waiting for her; she could see them approaching. When she alighted, she heard Spencer continue to curse at her; at the same time, Coleman saw Spencer pass a knife to Farquharson. The bus pulled away.

{¶ 13} Farquharson lunged toward Coleman with the knife. Coleman's son reacted by "running up, and * * * push[ing] him away * * *." Farquharson grabbed the boy's shirt front and sliced at his face, opening the skin near his eye. Al–Amin stepped in to defend the boy, and received stab wounds to both his chest area and one of his fingers.

{¶ 14} Seeing that Coleman was not alone, Spencer fled the fight. Similarly, in the face of Al–Amin's resistance to the attack, Farquharson soon followed. Coleman began "flagging down" passing motorists for help. One stopped and agreed to take Coleman's son and Al–Amin to a hospital.

{¶ 15} Coleman subsequently filed the instant action against RTA and the unknown bus driver.[1] Coleman alleged that while acting within the scope of his employment for a "common carrier," RTA's bus driver, despite notice of a danger of injury to a passenger, "negligently, recklessly, maliciously, and with wanton disregard, failed to protect" his passenger, and this failure was the proximate cause of both emotional injury to Coleman and physical injuries to her son and boyfriend.

{¶ 16} RTA's answer denied the pertinent allegations of the complaint and set forth several affirmative defenses. Following discovery, RTA filed a motion for summary judgment with respect to Coleman's claims. RTA argued that, pursuant to the "public duty doctrine," it had "no duty to provide police protection" to a passenger since no statute created such a duty. RTA further argued that it was immune from liability pursuant to R.C. Chapter 2744.

{¶ 17} RTA attached evidentiary material to its motion. These documents included a copy of Coleman's deposition testimony, along with two affidavits.

---

1. The record reflects that RTA never provided Coleman with the identity of the bus driver; therefore, Coleman failed to obtain service on him.

According to its acting systems security supervisor, on the night of the incident, "Transit Police received no calls * * * or reports of incidents involving any No. 6 bus * * *." Similarly, RTA's assistant manager of service quality indicated that the relevant database reflected "no radio communications from any operators on the No. 6 bus line reporting any passenger disturbances * * * threatened assaults, overt alarms, or covert alarms on September 12, 2005 from 7:30 p.m. to Midnight."

{¶ 18} Coleman filed a brief in opposition to RTA's motion. She argued that the common carrier's duty to provide protection for its passengers fell under common law rather than statute. Additionally, she argued that the facts of this case indicated the existence of genuine issues with respect to RTA's entitlement to immunity from liability on her claims under R.C. 2744.01 et seq.

{¶ 19} Coleman supported her position with, inter alia, a copy of the relevant portion of the bus-operator handbook, which RTA provided to its drivers. According to section D, paragraph 8, "In the event that a passenger disturbance impacts on the safety of other customers, the operator will stop the coach, evacuate the customers if necessary, and notify Service Quality for assistance or summon an available police officer or supervisor."

{¶ 20} Coleman also supplied the trial court with a copy of the deposition testimony of Alan Erenrich, RTA's director of service management, who authored its bus-operator handbook.

{¶ 21} Erenrich stated that each coach was equipped with two emergency call buttons ready at hand to the bus operator. If the driver pushed the "overt button," the call would "show up on the * * * transit police dispatcher's screen," alerting the dispatcher to radio the driver. If the driver pushed the "covert button," the alert not only displayed on the transit police dispatcher's screen, but it opened a microphone inside the bus "so that the * * * dispatcher can hear whatever's going on in the bus," thus enabling the dispatcher to locate the bus position via a global-positioning system and to assess the situation without using the bus radio. The driver could push either button without detection.

{¶ 22} Erenrich additionally opined that if a bus driver became aware of threats to a passenger from another passenger, the driver should use "his judgment" to contact the transit police. Similarly, if the passenger being threatened made that specific assertion, the driver "should call the police."

{¶ 23} Coleman further provided the trial court with the affidavit of East Cleveland detective Jay Hodge. Hodge stated that if his police department had been notified on September 12, 2005, of a threatened assault involving a weapon upon an RTA passenger, a unit would have been able to respond to the bus stop within two minutes. Such a timely notification of the threat before the bus

reached the stop "more likely than not" would have "prevented the attempted assault on Diane Coleman and the actual assault upon Brandon Coleman and Enoch Al–Amin."

{¶ 24} After RTA filed a brief in reply to Coleman's arguments, the trial court issued a journal entry that granted RTA's motion for summary judgment without particularizing the basis for its decision.

{¶ 25} Coleman presents two interrelated assignments of error for this court's review. In them, she argues that the trial court improperly granted summary judgment to RTA.

{¶ 26} On a motion for summary judgment, the moving party has the burden of demonstrating that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46. Thus, the moving party must inform the court of the basis of the motion and identify evidence in the record that affirmatively shows that the nonmoving party cannot support her claims. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264. The nonmoving party is entitled to have the evidence construed most strongly in her favor. Civ.R. 56(C).

{¶ 27} RTA provided the trial court with two bases for its motion. First, it asserted that the "public duty" doctrine applied to bar Coleman's claim of negligence against it.

{¶ 28} As articulated in *Sawicki v. Ottawa Hills* (1988), 37 Ohio St.3d 222, 525 N.E.2d 468, paragraph two of the syllabus, the doctrine provides a limitation on the existence of a public entity's duty toward its private citizens. Thus, when a statute imposes a duty upon a public entity which is intended for the public good, the failure to adequately perform the duty does not permit a private right of redress for injuries caused by that failure.

{¶ 29} The "public duty" doctrine was created in response to the judicial abrogation of common-law principles of sovereign immunity. Id. at 225, 525 N.E.2d 468. This court, however, has determined that the doctrine, as it applies to political subdivisions, "has been superseded by the enactment of the Political Subdivision Tort Liability Act, codified at R.C. Chapter 2744, et seq." *Sudnik v. Crimi* (1997), 117 Ohio App.3d 394, 397, 690 N.E.2d 925. This act is the reinstatement, in statutory form, of the common-law doctrine of "sovereign immunity." Id.

{¶ 30} The Ohio Supreme Court has indicated a lack of intent to overturn the foregoing determination. *Wallace v. Ohio Dept. of Commerce, Div. of State Fire Marshal,* 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, fn. 13. Therefore, RTA's first basis for a grant of summary judgment in its favor lacked merit.

■ {¶ 31} RTA's second basis for its motion was an assertion of sovereign immunity pursuant to R.C. 2744.02(A)(1). That statute classifies the functions of political subdivisions as either "governmental" or "proprietary" and states that *"[e]xcept as provided in subdivision (B)* of this section, a political subdivision is *not* liable in damages in a civil action for injury, death or loss to person or property allegedly caused by *any act or omission of* * * * *an employee* of the political subdivision in connection with" those functions. (Emphasis added.)

{¶ 32} Since R.C. 2744.01(G)(2)(c) specifies that the operation of a transit company is classified as a "proprietary" function, the statutes have "been held to be applicable to regional transit authorities." *Martin v. Cent. Ohio Transit Auth.* (1990), 70 Ohio App.3d 83, 91, 590 N.E.2d 411.

{¶ 33} Thus, RTA was immune from liability in this case unless the evidence demonstrated a fact question with regard to the existence of an exception to immunity under R.C. 2744.02(B). That subsection provides, "subject to" R.C. 2744.03, that the political subdivision "is liable," if, inter alia, the injury is "caused by the negligent performance of acts by [its] employees with respect to proprietary functions * * *." R.C. 2744.03 provides "defenses" if an exception to immunity, as set forth in R.C. 2744.02(B), exists.

{¶ 34} For instance, pursuant to subsection R.C. 2744.03(A)(3), immunity remains if the "failure to act by the employee involved * * * was within the discretion of the employee with respect to * * * enforcement powers by virtue of the duties and responsibilities of the * * * position * * *." Similarly, immunity remains if the injury "resulted from the exercise of judgment or discretion in determining * * * how to use * * * resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C. 2744.03(A)(5).

■ {¶ 35} In order to defeat a motion for summary judgment in a negligence action, the plaintiff must identify a duty owed to her by the defendant. *Peterson v. Greater Cleveland RTA* (Jan. 26, 1995), Cuyahoga App. No. 67603, 1995 WL 32867, citing *Keister v. Park Centre Lanes* (1981), 3 Ohio App.3d 19, 3 OBR 20, 443 N.E.2d 532.

{¶ 36} RTA did not dispute that the bus driver was acting within the scope of his employment on the night of the incident. Cf. *Martin v. Cent. Ohio Transit Auth.,* 70 Ohio App.3d 83, 590 N.E.2d 411. At common law, a "common carrier" owed "the highest duty of care for the safety of [its] passengers." Id., citing *Jones v. Youngstown Mun. Ry. Co.* (1937), 133 Ohio St. 118, 10 O.O. 125, 12 N.E.2d 279. Furthermore, "it has been held that a driver of a common carrier has an affirmative duty to protect his passengers." Id. at 93, 590 N.E.2d 411.

{¶ 37} Coleman's evidence, as expressed by Erenrich's testimony in conjunction with the relevant portion of the bus-operators' handbook, indicated that RTA expected its drivers to understand and to fulfill this "affirmative duty." Erenrich admitted that alerting the transit dispatcher to a potentially dangerous situation was a simple matter of pushing a button, an act that placed the driver himself in no jeopardy. Coleman's deposition testimony left no doubt that she made the driver aware of the situation; Spencer stood in the aisle over her as she did so.

{¶ 38} Indeed, RTA's own evidence, provided in support of its motion, supported Coleman's claim of negligence. RTA established the fact that on the night of the incident, the transit security dispatcher received no alerts from a No. 6 bus. The evidence, therefore, indicated that the driver made not even a minimal effort to fulfill his duty of care toward his passenger Coleman. *Peterson v. Greater Cleveland RTA.*

{¶ 39} The operator simply drove, ignoring the situation, and ignoring Coleman's request for help. Coleman testified that Spencer and Farquharson menaced her for over "ten minutes" while the bus proceeded on its route. Finally, after refusing her request for help one last time, thus ensuring that Coleman got off the bus at the same stop as the people who were threatening her with bodily harm, the bus operator drove away. *Estate of Ridley v. Hamilton Cty. Bd. of Mental Retardation and Developmental Disabilities,* 150 Ohio App.3d 383, 2002-Ohio-6344, 781 N.E.2d 1034.

{¶ 40} Hodge averred that a simple alert directed to the East Cleveland police department while the situation was in progress would have ensured police presence at the bus stop upon Coleman's arrival there. This would "more likely than not" have prevented the attack.

{¶ 41} It is clear that the evidence, when construed most strongly in Coleman's favor, failed to demonstrate that RTA was entitled to judgment as a matter of law on Coleman's claim. *Peterson v. Greater Cleveland RTA*; cf. *Ward v. Greater Cleveland RTA* (May 26, 1988), Cuyahoga App. No. 53754, 1988 WL 86424.

{¶ 42} Rather, genuine issues of material fact remained with respect to whether RTA established its immunity from liability, whether Coleman proved the existence of an exception to that immunity, whether the evidence demonstrated that RTA could establish a defense if an exception existed, and whether, ultimately, Coleman's injuries proximately were caused by either "negligent" or wantonly "reckless" behavior on the driver's part.

{¶ 43} Based upon the foregoing, Coleman's assignments of error are sustained. The trial court's order is reversed.

Judgment reversed.

GALLAGHER, P.J., concurs.

STEWART, J., dissents.

MELODY J. STEWART, Judge, dissenting.

{¶ 44} I respectfully dissent from the decision reached by the majority. The facts in this case, as set forth by appellants, are quite disturbing. However, at a minimum I do not see how appellants can meet the burden of showing causation.