BARR, Admr., Appellant,

v.

FREED et al., Appellees.

[Cite as *Barr v. Freed* (1997), 117 Ohio App.3d 228.]

Court of Appeals of Ohio,
Seventh District, Columbiana County.

No. 95–CO–84.

Decided Jan. 17, 1997.

*Katherine M. Braun,* for appellant.

*John C. Pfau,* for appellees Columbiana County Department of Human Services and Carole Freed.

*Jeffrey W. VanWagner,* for appellee Charles Boehm, d.b.a. Char–Lynn Group Home.

JOSEPH E. O'NEILL, Presiding Judge.

In April 1993, a complaint was lodged against Robert Wayne Barr, alleging him to be an unruly child and an abused child, and in April 1993, the Columbiana County Court of Common Pleas, Juvenile Division, placed temporary custody of Robert with the Columbiana County Department of Human Services ("CCDHS").

Carole Freed was assigned as a caseworker to work with Robert. At that time, Freed was supervised by Judith Fannin.

A case plan was submitted by Freed in May 1993, and the case plan was adopted by the juvenile court. At the time of being placed in custody of the CCDHS, Robert was placed in the Char–Lynn Group Home run by Charles Beohm.

In August 1993, Robert was placed in foster care with David and Melinda Burnip, in Lisbon, Ohio. The Burnips were a young couple in their early twenties with three children and were deemed by Freed to be appropriate for the placement of Robert.

Robert got into some difficulties while at the Burnip residence, including a suicide attempt on November 17, 1993, when he took an overdose of medications. The Burnips took Robert to the Salem Hospital. Freed talked to Robert at the hospital and talked to his advocate and guardian *ad litem,* Chuck Brown. They determined that a change in counselor was appropriate.

A referral was made to Bill Kissell at the Columbiana County Mental Health Center. Kissell began counseling with Robert after he was released from the hospital following a three-day stay. He was released from the hospital as being nonsuicidal. Kissell assessed him as being a low risk for further suicide.

On December 16, 1993, a court review was conducted and Robert was retained in the Burnips' home.

Late in the evening, on Saturday, December 18, 1993, Freed received a telephone call from the Burnips about Robert. There was an allegation by the Burnips' two-year-old son that Robert had sexually molested him. The Burnips were not quite sure what to do, or whether or not charges should be filed. Freed consulted with her supervisor, Judith Fannin, who called and talked to the Burnips about the situation, including Robert's mental condition. It was eventually agreed between Freed, Fannin and the Burnips that Robert should be removed from the home. Several options were considered, including a juvenile detention facility. Eventually, Freed and Fannin settled on Char–Lynn Group Homes because Robert had been at Char–Lynn before and was familiar with it.

Freed picked Robert up at the Burnips' home and transferred him to the Char–Lynn Group Home in Carrollton, Ohio. During this time, Robert was dressed in blue jeans, a shirt, and a jacket, and was carrying a bottle of pop and a plastic bag with other clothing in it. Carole Freed did not search Robert.

Upon arriving at Char–Lynn, Robert was checked in by the intake worker and Freed told the intake worker that Robert had attempted suicide in November, and to keep an eye on him and to secure his medications. Freed had no contact with Robert on Sunday, December 19, 1993. During the morning of December

20, 1993, Freed made some phone calls concerning Robert and discussed the investigation of the alleged sexual acts with her supervisor, Fannin. Shortly before noon, she received a call from Beohm that Robert had committed suicide with a gun that eventually was found to have belonged to David Burnip.

Christine Barr, administrator of the estate of Robert, filed a complaint on June 2, 1994 in the trial court. In this complaint, Christine Barr, the appellant, charged that Freed and the Columbiana County Department of Human Services willfully, wantonly and/or recklessly failed to carry out their duty of care to Robert by failing to properly supervise, take adequate measures, and provide appropriate treatment to Robert and that this conduct proximately led to Robert's death. Also named as defendants in the complaint were Charles Beohm doing business as Char–Lynn Group Home, David Burnip and Melinda Burnip. The foregoing parties are not parties to this appeal.

Following discovery, the appellees, CCDHS and Carole Freed, filed a motion for summary judgment along with supporting evidence, on October 16, 1995, alleging that they were immune from liability. At that point, the appellant, Barr, filed a motion for leave to file an amended complaint against these appellees to include a count of negligence. The appellees filed a responsive brief opposing appellant's motion. The appellant also filed a brief opposing appellees' motion for summary judgment.

On November 17, 1995, the trial court filed its opinion and judgment entry overruling the appellant's motion to amend the complaint and granting the motion for summary judgment filed by the appellees, thereby dismissing the action as against them. A timely notice of appeal was filed.

The first assignment of error contends that the trial court erred in granting summary judgment to the appellee, Carole Freed, when there were genuine issues of material fact demonstrating that Freed's conduct was wanton and/or reckless.

The appellant contends that Freed should have been held liable for the death of Robert because her conduct fell within the exception to general immunity afforded to governmental bodies and employees as it appears in R.C. 2744.03(6), which reads as follows:

"In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or section 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:

" * * * *

"(b) His acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."

The juvenile judge very specifically ruled in his final judgment that "[a]s a matter of law, this court finds that Freed's actions were not willful, wanton, or reckless, and she is immune by Section 2744.03, and the complaint against her must be dismissed."

A political subdivision and its employees are not liable for damages in a civil action for death caused by an act or omission of the political subdivision or any of its employees in connection with the exercise of a governmental or proprietary function. R.C. 2744.02(A)(1). For purposes of R.C. Chapter 2744, a county is a political subdivision, R.C. 2744.01(F), and the operation of a county human services department is a governmental function, R.C. 2744.01(C)(2)(m). The Supreme Court has defined malicious as meaning " 'indulging or exercising malice; harboring ill will or enmity.' " *Teramano v. Teramano* (1966), 6 Ohio St.2d 117, 118, 35 O.O.2d 144, 145, 216 N.E.2d 375, 377. In *Bush v. Kelley's, Inc.* (1969), 18 Ohio St.2d 89, 92, 47 O.O.2d 238, 239–240, 247 N.E.2d 745, 747–748, the Supreme Court defined malice: " 'Malice in the legal sense signifies a wilful design to do another injury, and this regardless of the fact that such design was prompted by hatred or revenge, or by hope of gain.' " The court went on to further define malice as " '[i]ntention or desire to harm another usually seriously through doing something unlawful or unjustified.' "

In support of her contention that the defendant-appellee Freed was wanton and reckless in her care exercised as to the decedent, the appellant points to the deposition testimony offered by Dr. Nancy J. Huntsman, a licensed clinical psychologist. In her deposition, Huntsman opined: "[T]he failure to complete a risk assessment concerning the decedent's suicidal ideation and lethality was an outrageous failure to provide care by the person who was assigned to be in charge of that by the agency."

The juvenile judge very painstakingly reviewed the facts which were before him. He found that it was clearly established that in November 1993 the decedent had apparently attempted to overdose on Dilantin and phenobarbital as a result of a domestic quarrel concerning his grades. He found that the decedent was removed to the Salem Hospital and that, upon his removal from the hospital, he was under the care of a counselor who had seen the child at four different times. The counselor rated the child as a low risk for suicide. The doctor who released the decedent from the hospital in November had rated the decedent as nonsuicidal. At the same time, the decedent was conferring with his guardian *ad litem*, Chuck Brown, and until the evening of December 18, 1993 seemed to be, by all appearances, getting along adequately at his foster parent's home.

The juvenile judge went on to find from the uncontradicted facts before him that, on the night Freed removed the decedent from the foster parents' home, she was acting under impressions that she had gleaned from her supervisor, who had talked to the Burnips about how the child was taking the situation. The judge further found that Freed discussed with the decedent the possible ramifications of an investigation into allegations of sexual abuse and the fact that he himself might be a victim. The judge specifically found that Freed did not do any formal suicidal assessment as Dr. Huntsman would have required her to do. The juvenile judge went on to further find from uncontradicted facts that when Freed removed the child from the Burnip home to the Char–Lynn Group Home, she had no evidence that the decedent was a high risk for suicide. The judge found that Freed warned the intake officer at Char–Lynn Group Homes about the decedent's medication and that they should be protected. The trial judge concluded that, as a matter of law, Freed's actions were not wilful, wanton or reckless and that therefore she was immune from suit.

Upon our review of the facts before the juvenile judge when he came on to consider the motion for summary judgment, we cannot conclude that he erred in his factual findings or his legal conclusion. The juvenile judge did not discount the opinion of Dr. Huntsman, and, in fact, he found that it supported a determination that Freed might have exercised bad judgment or even negligence.

The first assignment of error is found to be without merit.

■ The second assignment of error complains that the trial court erred in overruling appellant's motion to amend her complaint and dismissing appellee CCDHS when an exception to sovereign immunity under R.C. 2744.02(B)(4) applies in the case. R.C. 2744.02(B)(4) reads as follows:

"Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to persons or property that is caused by the negligence of their employees and that occurs within or on the grounds of buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and court-houses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code."

The juvenile judge stated in his opinion, referring specifically to R.C. 2744.02(B)(1), (3), (4), and (5), that political subdivisions are immune from lawsuits stemming from their employee's negligent or reckless acts. All parties agree that by way of agreement children were placed by the CCDHS in the Char–Lynn Group Home and further that the CCDHS keeps a written informa-tion file regarding that facility. In the case of *Zimmerman v. Kalu Canfield*

*Driving Range* (June 10, 1993), Mahoning App. No. 92 C.A. 98, unreported, 1993 WL 205014, this court interpreted R.C. 2744.02(B)(4) as follows:

"This subsection holds subdivisions liable for injury or loss to persons caused by the negligence of their employees that occur on the grounds of buildings used in connection with the performance of a governmental function."

The CCDHS is a governmental function. The Char–Lynn Group Home was a building used in connection with the performance of the functions of CCDHS. The appellees respond to this issue of liability by contending that defenses and/or immunities set forth in R.C. 2744.03(A)(3) and (5) preclude a liability finding against the defendant CCDHS and Carole Freed. R.C. 2744.03(A)(3) and (5) read as follows:

"(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to persons or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:

" * * *

"(3) The political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee."

" * * *

"(5) The political subdivision is immune from liability if the injury, death, or loss to persons or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in wanton or reckless manner."

We do not conclude that the actions of Freed or of the CCDHS amounted to policymaking, planning or enforcement powers. It is rather our opinion that an issue of a material fact exists as to whether Freed was negligent and whether her negligence occurred within or on the grounds of a building that was used in connection with the performance of a governmental function. These two factual issues prevent summary judgment and also stand for an allowance to the plaintiff to amend her complaint.

This second assignment of error is found to have merit.

Prior to the action by the Supreme Court in knocking down the common-law theories of sovereign immunity, there existed among the plethora of doctrines a

theory of special relationship. This doctrine held public agencies and their agents accountable for failure to perform a duty to a specifically identified individual. "Special relationship" was defined in paragraph four of the syllabus in *Sawicki v. Ottawa Hills* (1988), 37 Ohio St.3d 222, 525 N.E.2d 468, as follows:

"In order to demonstrate a special duty or relationship, the following elements must be shown to exist: (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking."

However, the *Sawicki* court did not address R.C. Chapter 2744. Very obviously, the legislature adopted R.C. Chapter 2744 so as to provide specific immunities to various governmental agencies. Article I, Section 16, Ohio Constitution, reads as follows:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

It is our opinion that R.C. Chapter 2744 provided by law how suits may be brought against the government. We go on to reason that the adoption of R.C. Chapter 2744 abrogated the special-relationship theory of liability.

This third assignment of error is found to be without merit.

The judgment is affirmed in part and reversed in part.

*Judgment affirmed in part and reversed in part.*

GENE DONOFRIO and COX, JJ., concur.