**KRAYNAK, Appellant and Cross–Appellee,**

v.

**YOUNGSTOWN CITY SCHOOL DISTRICT BOARD OF EDUCATION
et al., Appellees and Cross–Appellants.**

[Cite as *Kraynak v. Youngstown City School Dist. Bd.
of Edn.,* 172 Ohio App.3d 545, 2007-Ohio-1236.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 05 MA 200.

Decided March 12, 2007.

Levin & Associates Co., L.P.A., Joel Levin, and Christopher M. Vlasich, for appellant and cross-appellee.

Pfau, Pfau & Marando and John C. Pfau; Roth, Blair, Roberts, Strasfeld & Lodge and James E. Roberts, for appellees and cross-appellants.

WAITE, Judge.

{¶ 1} Appellant, Donald T. Kraynak, individually and as the parent and guardian of D.K., a minor, filed suit against appellees, Youngstown City School Board of Education, and D.K.'s former teacher, Helen Marino, for their failure to report his abuse during the 1999–2000 school year. D.K. advised Marino in his journal that his mother had abused him. Marino read at least one journal entry to this effect, but did not report the alleged abuse.

{¶ 2} Appellant dismissed the count against Marino personally, and the case proceeded to jury trial against the Youngstown City School District Board of Education based on Marino's agency with the school. Appellant presented two theories of liability: negligence based on the special relationship between teachers and students and negligence per se based on a teacher's statutory duty to report suspected abuse. He also asserted a claim for loss of consortium.

{¶ 3} The jury returned a defense verdict; six of the eight jurors found in favor of appellees. The jury specifically found that the preponderance of the evidence did not establish that Marino knew or suspected that D.K. had suffered or faced abuse, and thus she had no duty to report. The jury also concluded that appellees were not negligent and that D.K.'s injuries were not directly and proximately caused by Marino's negligence or her failure to comply with the reporting statute.

{¶ 4} Appellant filed a motion for judgment notwithstanding the verdict ("JNOV") or in the alternative, a new trial. The trial court overruled his requests on October 6, 2005, and appellant timely appealed to this court.

{¶ 5} Appellant raises four assignments of error on appeal. He alleges that the trial court erroneously denied his motion for JNOV, that the jury's verdict was against the manifest weight of the evidence, and that the trial court erred in determining that R.C. 2151.421 is a subjective standard and in allowing appellees' expert to testify as to the subjective nature of the statute.

{¶ 6} In its cross-appeal, appellees argue that the trial court erred in presenting appellant's negligence claim to the jury since this claim was abrogated by sovereign immunity.

{¶ 7} For the following reasons, we hereby sustain appellant's third and fourth assignments of error and grant appellant a new trial. We overrule appellees' sole cross-assignment of error.

{¶ 8} We will address appellant's third assignment of error first, since it concerns the law as provided to the jury. In this assignment of error, appellant claims:

{¶ 9} "The trial court committed reversible error when it determined that R.C. 2151.421 utilizes a subjective, rather than objective, standard."

{¶ 10} R.C. 2151.421 places a duty on a school teacher, a school employee, and school authority to report known or suspected child abuse. Further, a teacher's failure to report known or suspected abuse is imputed to the teacher's employer pursuant to the doctrine of respondeat superior. *Grimm v. Summit Cty. Children Servs. Bd.*, 9th Dist. No. 22702, 2006-Ohio-2411, 2006 WL 1329689, ¶ 30.

{¶ 11} A political subdivision is generally not liable for a plaintiff's injury, death, or loss pursuant to R.C. 2744.02. However, R.C. 2744.02(B) sets forth exceptions to the general rule. The applicable version of R.C. 2744.02(B)(5) in the instant case would allow a political subdivision to be found liable when liability is expressly imposed by a section of the Revised Code.

{¶ 12} The Ohio Supreme Court has also held that pursuant to this version of R.C. 2744.02(B)(5), a political subdivision may be held liable for a teacher's failure to perform a duty expressly imposed by R.C. 2151.421. *Campbell v. Burton* (2001), 92 Ohio St.3d 336, 750 N.E.2d 539, paragraph two of the syllabus. Campbell applied at the time the alleged failure to report occurred in the instant matter. Hence, appellant sued the school district. Since Campbell, however, the legislature has amended R.C. 2744.02(B)(5) to permit a political subdivision to be sued under that statute only when the liability expressly imposed by a section of the Revised Code is civil. *Estate of Ridley v. Hamilton Cty. Bd. of Mental Retardation & Developmental Disabilities*, 102 Ohio St.3d 230, 2004-Ohio-2629, 809 N.E.2d 2, fn. 3.

{¶ 13} This claimed error concerns whether the duty to report a suspicion of abuse pursuant to R.C. 2151.421 is viewed subjectively or by using the objective-person standard. Appellant submitted proposed jury instructions in which he sought to have the trial court submit the statute itself to the jury. Despite appellant's request, the trial court did not provide the actual statutory language to the jury. In addition, the trial court judge advised the jury that R.C. 2151.421 employs a subjective standard, and thus it was to determine whether Marino herself suspected abuse and was not left to determine merely whether a "reasonable person" would so suspect.

{¶ 14} A party is usually entitled to the inclusion of his requested jury instruction if it is a correct statement of the law applicable to the case. *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 575 N.E.2d 828. This assignment of error concerns whether the jury instructions, as provided, correctly and completely stated the applicable law. Thus, appellate review of the trial court's refusal to provide appellant's requested instruction is conducted de novo because

this is purely a legal question. *Wood v. U.S. Bank*, 160 Ohio App.3d 831, 2005-Ohio-2341, 828 N.E.2d 1072, ¶ 20, citing *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1996), 76 Ohio St.3d 521, 668 N.E.2d 889.

{¶ 15} R.C. 2151.421(A)(1)(a) states:

{¶ 16} "No * * * [school teacher; school employee; school authority] who is acting in an official or professional capacity and knows or suspects that a child under eighteen years of age * * * has suffered or faces a threat of suffering any physical or mental wound, injury, disability, or condition of a nature that reasonably indicates abuse or neglect of the child, shall fail to immediately report that knowledge or suspicion."

 {¶ 17} There is no definitive case on point as to whether a teacher's suspicion is viewed using an entirely subjective standard or if it is based on an objective, reasonable-person standard. Nonetheless, it has been held that "[w]here a jury instruction is given in accordance with statutory language, a court should generally limit its instruction to such language." *Sheeler v. Ohio Bur. of Workers' Comp.* (1994), 99 Ohio App.3d 443, 451, 651 N.E.2d 7, citing *State v. Shue* (1994), 97 Ohio App.3d 459, 471, 646 N.E.2d 1156. Thus, the trial court judge should have simply presented the text of the statute in this case. He did not. Instead, the trial court judge advised the jury of the following in his instructions:

{¶ 18} "A teacher has a duty to report child abuse to the proper authorities when the teacher knows or suspects that a child under 18 years of age has suffered or faces a threat of suffering any physical or mental wound, injury, disability, or condition of a nature that reasonably indicates abuse or neglect of the child.

{¶ 19} "The statute sets forth a subjective standard and you must determine whether defendant, Helen Marino, in her mind, knew or suspected [D.K.] suffered or faced a threat of suffering any physical or mental wound, injury, or disability, or condition of a nature that reasonably indicates abuse or neglect of [D.K.]."

{¶ 20} Appellant directs this court's attention to *Surdel v. MetroHealth Med. Ctr.* (1999), 135 Ohio App.3d 141, 733 N.E.2d 281, in support of his argument that R.C. 2151.421 employs an objective-person standard. *Surdel* held in part that R.C. 2151.421 grants immunity to those who report abuse even if their suspicion as to the abuse is unreasonable.

{¶ 21} The facts in *Surdel* are as follows: John and Laurie Surdel were separated, and Laurie suspected that John had been abusing their children. She contacted the county children's services agency, and John was eventually prosecuted for multiple counts of felonious sexual penetration. He was later acquitted

of all charges. John subsequently filed tort claims against the investigating county agencies and the medical center that had examined his children for physical signs of abuse. The defendants sought and were granted summary judgment on the basis that they were immune from liability. John appealed, claiming that immunity was inapplicable to any subsequent reporters of child abuse and that their diagnoses and opinions were not given in good faith or within an objective standard of reasonableness.

{¶ 22} On appeal, the Eighth District Court of Appeals stressed the importance of encouraging persons to report child abuse and stated that mandatory reporters are entitled to immunity, "regardless of whether the report was made in good faith." Id. at 147, 733 N.E.2d 281. In addressing Surdel's claims that the reports of abuse in his case were not reasonable, the court stated:

{¶ 23} "Surdel further argues that immunity will be provided under R.C. 2151.421(G)(1)(a) only if the reporter's suspicions are 'reasonable.' Surdel bases this argument on the text of R.C. 2151.421(A)(1)(a), which requires that any knowledge or suspicion be immediately reported when there is 'any physical or mental wound, injury, disability, or *condition of a nature that reasonably indicates* abuse or neglect of the child.' (Emphasis added.) * * * We think Surdel misconstrues the statute.

{¶ 24} "The statute describes the kinds of indicators on which the reporter may rely. The qualifying language clarifies that *the duty to report* does not require absolute proof but rather *is triggered when the condition reasonably indicates abuse or neglect.* The statute's focus is on the condition, not the reporter." (Emphasis added.) Id. at 150, 733 N.E.2d 281.

{¶ 25} The fact that the legislature provides any and all reporters of suspected abuse with immunity, even if the report was not made in good faith, appears to support appellant's argument here.

{¶ 26} Appellant presented his argument based on *Surdel* to the trial court in his motion in limine, but the court rejected his objective-suspicion argument. The trial court then instructed the jury to use the subjective standard.

{¶ 27} In *Yates v. Mansfield Bd. of Edn.*, 102 Ohio St.3d 205, 2004-Ohio-2491, 808 N.E.2d 861, the Ohio Supreme Court concluded that a board of education may be held liable when its failure to report the abuse of a student results in the abuse of another student. During the 1996–1997 school year, Amanda, a ninth-grade student at Mansfield Senior High School, advised certain school officials, including the principal, that on three separate occasions her coach and teacher inappropriately touched her and made sexual comments to her. The principal investigated the claims and concluded that Amanda was lying. Her allegations

were never reported, and she was suspended for harassing her teacher. Id. at ¶ 2–3.

{¶ 28} Three years later, the same teacher sexually abused another student, named Ashley. Ashley's parents filed suit, claiming that the school had failed to report Amanda's allegations of abuse and that Ashley was injured as a result. Ashley's parents also made a claim based on the negligent retention of the teacher.

{¶ 29} In considering the applicability of the reporting requirement found in R.C. 2151.421, the Ohio Supreme Court stressed that the legislature designed the statute to promote the early identification of child abuse, stating that it "clearly encouraged reporting and specifically discouraged the failure to report by imposing a criminal penalty * * *." Id. at ¶ 23–24. It further stated:

{¶ 30} "Because abused and neglected children lack the ability to ameliorate their own plight, R.C. 2151.421 imposes mandatory reporting duties on 'those with special relationships with children, such as doctors and teachers.' * * * These persons, when acting in their official or professional capacity, hold unique positions in our society." Id. at ¶ 30.

{¶ 31} The *Yates* court concluded that when school officials "are informed that one of their schoolchildren has been sexually abused by one of their teachers, they should readily appreciate that all of their schoolchildren are in danger." Id. at ¶ 45. Thus, it concluded that a board of education can be held responsible for its failure to report abuse of a student that results in the subsequent abuse of another student by the same teacher. Id.

{¶ 32} Although it was not specified in the *Yates* holding, it is clear that the majority of the Supreme Court found that Amanda's statement to her principal that she was being abused warranted reporting pursuant to R.C. 2151.421. (Justice O'Donnell stressed in his concurrence that whether the reporting statute was violated remained a question of fact for the jury to consider on remand. Id. at ¶ 50–51.)

{¶ 33} The Second District Court of Appeals, in considering the dismissal of a claim against a school official for her reporting of alleged child abuse, noted that "a school employee, is required to report any reasonable suspicion of child abuse." *Tracy v. Tinnerman*, 2nd Dist. No. 2003–CA–21, 2003-Ohio-6675, 2003 WL 22927758, ¶ 11.

{¶ 34} Appellees argue in response that the legislature has since amended R.C. 2151.421(A)(1)(a), making it clear that the duty to report suspected abuse is an objective-person standard. Appellees argue that this amendment clarifying that the duty is objective can only be interpreted to mean that the prior version must be viewed subjectively. While courts generally should not look to future versions

of a statute in determining legislative intent, the fact that language was added to R.C. 2151.421 making it apparent that the reporting duty is based on an objectively reasonable-person standard only bolsters appellant's argument that the standard was always intended to be objective.

{¶ 35} Based on the foregoing, the trial court judge in appellant's case erred in elaborating on the nature of the reporting duty found in R.C. 2151.421. There is absolutely no support, either in the statute itself or in case law, for such an interpretation. The trial court should have presented the text of the statute as written for the jury to consider in light of the evidence. Instead, the court construed the standard as subjective without authority to do so and added a layer of interpretation to the jury's deliberations not warranted by law.

{¶ 36} As will be seen in appellant's additional assignments of error, the trial court's elaboration was pivotal and appears to have predetermined an outcome at trial prejudicial to appellant. Thus, this assignment has merit, and we hold that the trial court erred in his jury instruction in this matter.

{¶ 37} Appellant's fourth assignment of error is related to his third. In it, he claims:

{¶ 38} "The trial court committed reversible error when it allowed defendant-appellee/cross-appellant's expert, Kathryn Mercer, Ph.D., JD, MSSA, to testify as to the subjective nature of R.C. 2151.421."

{¶ 39} In this assignment appellant takes issue with the trial court's decision to allow appellees' expert witness, Kathryn Mercer, professor of law at Case Western Reserve Law School, to testify. Appellant filed a motion in limine in an effort to preclude Mercer from testifying, but was overruled.

{¶ 40} At trial, Mercer testified that she has taught public child-welfare workers for approximately 15 to 20 days annually for 17 years. Her classes cover compliance with the Ohio abuse reporting law. Although she does not actually instruct teachers, Mercer explained that as far as reporting abuse, her training sessions would also apply to a teacher's duty to report, since both teachers and welfare workers are mandated reporters under the same statute.

{¶ 41} Mercer testified that in her view, a mandatory reporter's knowledge or suspicion of abuse "is a personal judgment that each person must reach based— * * * based upon their training, education, their knowledge of the abuse, neglect, and dependency statute, the knowledge of the information they're receiving, and the accuracy, the determination whether that information is accurate."

{¶ 42} Mercer also explained that in determining whether knowledge or suspicion of abuse is present, a mandatory reporter should examine the totality of

the circumstances including "the child's demeanor, the child's behavior, whether there are visible signs of abuse, whether or not the child is truthful."

{¶ 43} Halfway through her testimony, appellant again objected to Mercer's testimony, arguing that she was invading the province of the judge by explaining the law and that she was invading the province of the jury in reaching ultimate conclusions in weighing the evidence. Out of the presence of the jury, Mercer explained that she spends about one and one-half hours teaching the reporting statute to social workers. During that time, her students read the statute and talk about it, and then she allows them to ask questions about their duty to report. In her discussions, she has explained that the duty to report does not necessarily arise just because a child says he or she has been abused. For instance, she explained that a child may say he is abused because his mother did not allow him to watch television. Accordingly, she advises her social workers in training that they need to look at the situation in its entirety based on their beliefs and any indicators of abuse. Thereafter, the judge decided that Mercer was allowed to continue to testify before the jury about what she teaches, but that she could not give her opinion as to what Marino believed or suspected.

{¶ 44} Thereafter, and without reading the statute to the jury, Mercer actually told the jury what the mandatory reporting law "says," but her explanation of its content appears incorrect.

{¶ 45} Mercer stated that the reporting law "says look at all the circumstances. So if a child—I teach that if a child would say my parent has hit me with a ruler, the social worker must then assess all the circumstances; what's the age of the child, was it appropriately placed, where was that hit, did it cause a—a serious disfigurement. The law actually requires, again, child endangering to be not just a bruise, but a serious disfigurement which is either temporary or permanent, and so we, you know, discuss what does that bruise look like, where was it placed, what was the context for which the child was being disciplined, is the child's report accurate, does the person believe the child. So all of that has to be taken into consideration rather than an automatic response upon hearing a particular fact."

{¶ 46} While the first half of Mercer's testimony may have been relevant since she explained her opinion and what she taught her students (although it is not at all clear on what basis she has formed these opinions and abundantly apparent that she reads nonexistent conditions into the statute), her testimony went too far when she told the jury what the statute allegedly "says." Contrary to her testimony, R.C. 2151.421 does not state that a person must review the totality of the circumstances. Mercer claimed that "child endangering" requires "serious disfigurement" and "not just a bruise." However, R.C. 2151.421 does not once make mention of child endangering and certainly does not require the presence of

serious disfigurement. The statute simply requires reporting of any known or suspected, actual or threatened "physical or mental wound, injury, disability, or condition of a nature that reasonably indicates abuse or neglect of the child." R.C. 2151.421.

{¶ 47} Thus, Mercer's testimony wherein she claims to tell the jury, incorrectly, the requirements of statute was erroneously admitted. Although she may have been properly allowed to testify as to what she teaches regarding the mandatory duty to report, with clarification that she describe on what basis her opinions are formed, she should have been prevented from editorializing about the alleged contents of the statute and testifying as to its contents. The statutory language in R.C. 2151.421 speaks for itself. Thus, Mercer's testimony should have been strictly and severely limited.

■ {¶ 48} Based on the foregoing, the trial court abused its discretion in allowing Mercer to testify to this extent. This error combined with the trial court's elaboration on the contents of the statute necessitate reversal of the jury's verdict.

{¶ 49} Returning to appellant's first and second assignments of error, these state:

{¶ 50} "The trial court committed reversible error when it denied plaintiff-appellant/cross-appellee's motion for judgment notwithstanding the verdict or, in the alternative, a new trial, under Civ. R. 50 and Civ. R. 59.

{¶ 51} "The jury committed reversible error when it rendered a verdict against the manifest weight of the evidence."

■ {¶ 52} Appellate courts review motions for judgment notwithstanding the verdict ("JNOV") de novo. *Schafer v. RMS Realty* (2000), 138 Ohio App.3d 244, 257, 741 N.E.2d 155. When considering a motion for JNOV, a trial court employs the same standard used in granting a motion for a directed verdict. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.* (1998), 81 Ohio St.3d 677, 679, 693 N.E.2d 271. The evidence is construed most strongly in favor of the nonmovant, who is given the benefit of all reasonable inferences from the evidence. *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68, 23 O.O.3d 115, 430 N.E.2d 935. A court must not weigh the credibility of the witnesses when reviewing such a motion. *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 28 OBR 410, 504 N.E.2d 19, syllabus.

{¶ 53} If the court finds that reasonable minds could not differ as to any determinative issue in the case, then the court must sustain the motion. Id. However, a motion for JNOV should be denied if there is substantial evidence upon which reasonable minds could come to different conclusions on the essential

elements of the claim. Civ.R. 50(A)(4); *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 344 N.E.2d 334.

{¶ 54} Appellant argues that when considering all of the evidence, especially the defense representative's admissions, reasonable minds could only have found in favor of appellant on both counts—negligence and negligence per se. This is true, appellant argues, especially when we consider that Marino testified that she read D.K.'s journal describing his abuse, and as a result, she altered her behavior toward him, deciding she needed to keep a closer eye on him.

{¶ 55} Appellant also relies on Superintendent McGee's and Principal Mastronarde's testimony in which they agreed that a child who reports abuse in his or her journal is enough to trigger a suspicion of abuse. Thus, appellant believes that he was entitled to JNOV.

{¶ 56} Appellant also argues that appellees' totality-of-the-circumstances argument was a red herring. He claims that a teacher would only need to consider the totality of the circumstances in looking at possible abuse if suspicion is present in the first place. Appellant claims that Marino would have had no need to discuss D.K. with his other teachers or to keep a closer eye on him if no suspicion existed.

{¶ 57} Civ.R. 59(A) lists the grounds on which a new trial may be granted. Appellant argued both at trial and on appeal that he is entitled a new trial pursuant to Civ.R. 59(A)(6). It states:

{¶ 58} "(A) Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

{¶ 59} " * * *

{¶ 60} "(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case."

{¶ 61} A trial court has discretion when ruling on a motion for a new trial, and a reviewing court should not disturb its decision absent an abuse of discretion. *Mannion v. Sandel* (2001), 91 Ohio St.3d 318, 321, 744 N.E.2d 759; *State v. Hawkins* (1993), 66 Ohio St.3d 339, 350, 612 N.E.2d 1227. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 62} When considering a motion for new trial on weight-of-the-evidence grounds, the trial court must review the evidence presented at trial and consider the credibility of the witnesses and the evidence. *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 92, 52 O.O.2d 376, 262 N.E.2d 685. A trial court may

grant a new trial only if there is no substantial, credible evidence upon which the jury could have arrived at its verdict. *Sims v. Rosenblatt* (July 31, 2000), 5th Dist. No. 1999CA00332, 2000 WL 1055899.

{¶ 63} As discussed, a teacher, school board, or other employee of a political subdivision may be held civilly responsible for his or her failure to report known or suspected child abuse in compliance with R.C. 2151.421. *Campbell v. Burton*, 92 Ohio St.3d 336, 750 N.E.2d 539, syllabus. Campbell was governed by a former version of R.C. 2744.02, but applies in the instant case since the alleged failure to report D.K.'s abuse occurred in the 1999–2000 school year.

{¶ 64} Again, R.C. 2151.421(A)(1)(a) states:

{¶ 65} "No * * * [school teacher; school employee; school authority] who is acing in an official or professional capacity and knows or suspects that a child under eighteen years of age * * * has suffered or faces a threat of suffering any physical or mental wound, injury, disability, or condition of a nature that reasonably indicates abuse or neglect of the child, shall fail to immediately report that knowledge or suspicion."

{¶ 66} The evidence presented at appellant's trial reveals the following: D.K.'s fourth-grade language-arts teacher, Mrs. Marino, testified in appellant's case-in-chief as if on cross-examination. She testified that before having D.K. in class, Marino was advised that his parents were going through a divorce and that he was very intelligent. Marino assigned journals as filler for her class. She allowed her students to write about whatever they chose, and she sometimes suggested topics. She told her students that she would read their journals, yet she testified that she only spot-checked them.

{¶ 67} Marino did not recall what portions of D.K.'s journal she had actually read during his fourth-grade year. She explained that she would leaf through a student's journal and read a few entries and make comments on them. However, the fact that she made comments on a certain entry did not mean that she had read all the prior entries in that particular journal.

{¶ 68} In one of D.K.'s early journal entries he asked: "Dear Mrs. Marino. I just wanted to know, do you read what we write everyday right exactly right [sic] after we write it?" She responded in writing, "not exactly after."

{¶ 69} Marino confirmed that she did read D.K.'s September 20, 1999 entry in which he stated;

{¶ 70} "Dear Mrs. Marino. I have a problem at my mom's apartment. My mom abuses me for little things, like, once when we had to go to Mother Goose (which is my baby sister's school), my school clothes were in back and [F.] (which is also my half sister) got in back and I started to pound light on the window.

My Mom told me to get in the front and I did. The door was open and she hit me and said, shut the door cause other grown ups were talking outside, and I shut the door. Then she started hitting me and punching me, screaming at me, saying what she was going to do with your stuff? Then she grabbed the bag of my school supplies and threw them up to me and grabbed my school clothes and threw the school clothes with her hand behind them, and since her hand was behind the clothes and purposely punched me in the gut."

{¶ 71} After the foregoing entry D.K. wrote in capital letters, "WARNING! BUT WHATEVER YOU DO, DON'T TELL MY MOM!!!" Marino admitted to reading the foregoing entry, but she could not recall whether she had talked with D.K. about it. She then stated that she thought she had talked with him about it because she recalled that he "didn't take this journal entry very seriously. He wasn't crying. He wasn't upset. He wasn't scared. * * * He wasn't emotionally upset about it."

{¶ 72} Notwithstanding, Marino said that she talked with D.K.'s other teachers about him, but she never contacted children services and she never reported his alleged abuse. Instead, she responded in writing to D.K.'s entry stating, "Okay. Sometimes adults have personal problems that they need to talk to someone about. They sometimes lash out * * * at innocent people without meaning to."

{¶ 73} Thereafter, Marino admitted on cross-examination that D.K.'s use of capital letters indicated a "possible fear of his mother." Marino also agreed that fear of a parent and claiming that the parent screams at the child, throws things at a child, and punches a child in the stomach are also possible signs of abuse.

{¶ 74} The Youngstown City School's child-abuse policy and child-abuse pamphlet from the school Assistant Superintendent were introduced during Marino's testimony. She was fully aware of the school's policy. The policy was read in part to the jury:

{¶ 75} " 'When considering the reporting of suspected child abuse or neglect, it is important to remember these facts: First, the law protects those authorities who report what they in good faith believe to be child abuse of neglect. The person who reports the abuse is in no way responsible for the final decision concerning the child.

{¶ 76} "Number two, 'it is far better to report a suspected abuse and make an error in judgment than to let an actual case of abuse go undetected and unreported.'

{¶ 77} " '* * *

{¶ 78} " 'Now, number three. 'Any ability to help the abused or neglected child by the proper agencies usually will correlate directly with the timeliness of the reporting.' "

{¶ 79} Marino had reported suspected child abuse twice before during her teaching career. She was incorrect about the abuse both times. She stated that she did not believe that D.K. was being truthful in his September 20 journal entry about his abuse.

{¶ 80} Further, it was brought out at trial that Marino stated in her discovery deposition that she did not believe that a child could be a victim of child abuse without showing signs of physical abuse. Notwithstanding, after reading D.K.'s September 20, 1999, journal entry she decided to keep a closer eye on him. Yet Marino's idea of keeping a closer eye on D.K. did not involve reading his journal on a more regular basis.

{¶ 81} Marino wholly denied reading D.K.'s next journal entry, which stated, "Dear Mrs. Marino: In the letter about my mother, what you wrote back was not true. My mother has no problems about anything. She lies, says the 'f' word a lot in front of kids, calls us assholes. She beats me for anything I say, and I'm scared to do anything or say anything. She also says I act like a girl."

{¶ 82} At trial Marino also denied reading another entry written in March, which stated:

{¶ 83} "Mrs. Marino. Happy birthday. I hope you have a nice birthday today. I hope nothing bugs you, gets on your nerves or upsets you. I want to tell you something. My mom really does abuse me. She beat me with the leather belt and left a big purple mark on my butt for almost a week. What should I do? [D.K.]"

{¶ 84} Marino also denied reading D.K.'s May 1, 2000 journal entry, which stated, "Dear Mrs. Marino. How come you don't answer my letters anymore? Can you start answering some of my letters or write comments about them? How come you answered my questions before and not now? [D.K.]"

{¶ 85} Benjamin McGee was Superintendent of the Youngstown City Schools during the 1999–2000 school year. He testified at trial that if a student or child advised him or a city teacher of abuse, that would be a reason to be concerned and suspicious. He also confirmed that the Youngstown City School policy was to err on the side of reporting if there was ever a doubt regarding abuse.

{¶ 86} McGee also established the school policy provided that a teacher has "a moral responsibility and a legal obligation to conscientiously observe and report possible abuse and neglect that is encountered in the performance of professional duties."

{¶ 87} Marilyn Mastronarde was the principal of West Elementary during D.K.'s fourth-grade school year in 1999–2000. Mastronarde agreed that if a student reports that he or she has have been abused, hit, or punched, then a

teacher would have a case of suspected child abuse. She also stated that teachers have an absolute duty to report suspected child abuse.

{¶ 88} D.K.'s father, Donald, also testified. He explained that he was divorced from D.K.'s mother, Melissa, and they initially had shared parenting. Once he started school, D.K. lived with Melissa during the school week through his fourth-grade year. D.K. stayed with Donald and his parents from Friday evenings through Monday mornings until Donald remarried.

{¶ 89} At the end of D.K.'s fourth-grade year, he told his grandmother about his journal. Following the disclosure of his abuse, D.K. required professional help. He was given medication for depression and posttraumatic stress disorder. D.K. also suffered from terrible nightmares. Donald was given full custody of D.K. as a result of the reports of abuse, and D.K.'s mother had limited supervised visitation with him.

{¶ 90} Prior to reading D.K.'s journal, Donald had no suspicions that his son was being abused. He never saw physical signs of abuse. Donald also revealed that Melissa had been threatening to move D.K. to Columbus at the end of his fourth-grade school year.

{¶ 91} D.K. also testified at trial. He explained that his mother mistreated him by beating him with various objects and calling him names. He recalled abuse by his mother from the time he was about two or three years old. He testified that he told his fourth-grade teacher, Mrs. Marino, at West Elementary about the abuse in his journal, but that he never directly talked to her about it. When he tried to talk with her, she told him that she was busy. D.K. said he wrote about the abuse in his journal because he did not think his mother would find out. Had he told his father or grandparents, he knew they would have confronted his mother.

{¶ 92} D.K. explained that he trusted Marino and that she told his class that she would read their journals. He said that his mother would often warned him not to tell anyone about the abuse. On one occasion, D.K. clogged the toilet, and in response, his mother punched him, pushed him to the ground, and started punching and slapping him. As a result, D.K. had continual problems going to the bathroom because he did not want to get in trouble.

{¶ 93} At the end of D.K.'s fourth-grade year, his mother began packing boxes for their move to Columbus. He said he was afraid that she would read his journal, so he told his grandmother about it.

{¶ 94} Donald's mother (D.K.'s grandmother), Sandra Kraynak, also testified. After Donald and Melissa's divorce, D.K. and Donald lived with her for quite some time. She and her husband helped take care of D.K. even after Donald remarried and moved out with his new wife. Toward the end of D.K.'s fourth-

grade year, Sandra noticed Franklin County plates on D.K.'s mother's car. Sandra mentioned it to her husband, and D.K. became hysterical. He then told her about his mother's abuse and the journal, stating that he thought he would get help.

{¶ 95} The next day Sandra sent a note to school with D.K. asking Marino not to give D.K.'s journal to his mother. She also called the principal and went to pick up the journal. The next day, she and Donald pulled D.K. out of school early. He has lived with his father ever since.

{¶ 96} Sandra explained that she had seen bruises on D.K.'s arms and legs over the years, but he always explained them away.

{¶ 97} Dr. Battista, D.K.'s main treating physician, died prior to trial. His discovery deposition was read into evidence. Battista was a certified educational school psychologist and had his doctorate as a counseling psychologist. He was also a school guidance counselor and had a master's degree in education.

{¶ 98} Battista was contacted by appellant's counsel to evaluate D.K. for purposes of this litigation. He was also contacted by D.K.'s father for help in dealing with the abuse. Battista concluded in his report that D.K. was hoping that Mrs. Marino would help him. Contrary to D.K.'s testimony, Battista concluded that D.K. was unable to really verbalize his abuse until after his counseling.

{¶ 99} Battista also testified that even if a teacher has no evidence of abuse, a teacher must report any abuse reported to them by a student so the allegation can be investigated by the proper authority. He explained:

{¶ 100} "Q So if somebody comes in and says, so and so's being abused, whether she believes it's credible or not, she's got to report it, is that your belief?

{¶ 101} "Yes, must. Not just my belief, it's a must."

{¶ 102} Battista concluded that Marino was neglectful and she had an absolute duty to report D.K.'s alleged abuse when she read his first journal entry in September 1999.

{¶ 103} Professor Paul Zionts also testified on appellant's behalf. He has a master's degree in elementary education and a doctorate in educational psychology. Zionts has published several books, including one on how to teach disturbed and abused students and one on how to deal with children with emotional problems.

{¶ 104} In reviewing D.K.'s journal, Zionts testified that the fact that D.K. wrote, "My mom abuses me" was enough to trigger a suspicion of abuse requiring a teacher to report. Zionts also concluded that the fact that D.K. had written in all caps, "WARNING! BUT WHATEVER YOU DO DON'T TELL MY MOM"

presented a suspicion of abuse because it showed a fear of his mother. Zionts felt that Marino's response that sometimes adults have problems was inadequate, since it explained away her behavior. He opined that Marino failed in her statutory duty to report.

{¶ 105} Zionts was unaware that Marino had assigned this journal as a creative writing journal. Nonetheless, even in the creative writing context, he felt that D.K.'s journal necessitated the reporting of suspected abuse. Zionts stated on redirect:

{¶ 106} "A. It doesn't matter to me on any level the purpose of the assignment.

{¶ 107} "Q. Why not?

{¶ 108} "A. It—because of the student's responses. It doesn't matter if he wrote this on the back of a test, it doesn't matter if he wrote this when he was doing a book report on *Of Mice and Men*. It doesn't matter. When a student tells you that these things are happening, you have to report it, especially repeated times.

{¶ 109} " * * *

{¶ 110} "A. In my opinion, virtually everybody who reads this [D.K.'s journal entries], whether they are teaching or whether they're learning to be teachers, would say that there is a possibility, a possibility of child abuse going on here."

{¶ 111} He further explained that D.K.'s potential motives for writing that he was abused are irrelevant.

{¶ 112} Dr. Stanley Palumbo, a licensed psychologist, testified for the defense. Palumbo has a Ph.D. and is a licensed clinical psychologist in Ohio. Palumbo reviewed the materials regarding D.K. and interviewed him along with his father and stepmother.

{¶ 113} Palumbo testified that the delay caused by Marino's failure to report the alleged abuse did not cause any "lasting effects." He further stated that he really did not have an opinion as to whether the delay caused D.K. any permanent damage. In his last appointment with D.K., D.K.'s responses corresponded with those of an average child.

{¶ 114} Marino testified on direct for the defense. She explained that she actually had D.K. in class for about one hour and 15 minutes four days a week. She was not D.K.'s homeroom teacher. She testified that she assigned the journal for "creative and expressive purposes" and that it was used as filler for about ten minutes one to two times per week. She did not actually grade or make grammar corrections in the journals.

{¶ 115} Marino explained that in looking for signs of abuse in a child, she generally looked at a student's behavior, physical signs of injury, emotional and

physical well-being, and a student's cleanliness. She explained that D.K. was a very likeable student who had good writing and reading abilities. She stated that throughout the year she noticed no signs of abuse by his mother, indicating, "I would figure he might be crying or depressed and unhappy; in fact, I've watched [D.K.] on occasions with other children joking and laughing. He enjoyed that. He loved to talk to the other kids. High-spirited."

{¶ 116} Upon reading D.K.'s September 20, 1999 journal entry, Marino explained that she was not alarmed and did not feel the need to report because she knew D.K. for a few weeks in class, and she did not suspect abuse. In going through signs of abuse listed in a school pamphlet, Marino explained that D.K. did not show any outward signs of abuse.

{¶ 117} However, she then stated that she kept his journal entry in mind, and she "looked at him in a more careful way than I would everybody else to make sure that maybe I didn't over—overstep my boundaries of is this child abused or not."

{¶ 118} At one point, Marino even asked the other teachers if they had any concerns about D.K. in the classroom. His other teachers felt he was doing well. Yet Marino never showed his journal to any other teachers. She said she thereafter saw nothing concerning D.K. that led her to believe that he was being abused.

{¶ 119} On direct, Youngstown School Superintendent Benjamin McGee explained that he believed the school's policy on reporting abuse took a subjective approach. Thereafter, however, McGee agreed that if a student told him that he had been abused, he "would be concerned and suspect abuse." He also agreed that a teacher has a duty to report any suspicion of abuse, but he then said that a teacher should justify his or her suspicion.

{¶ 120} As addressed previously, Professor Kathryn Mercer from Case Western Reserve Law School, also testified at trial. She explained that she teaches social workers in training about their duty to report suspected abuse. She teaches them that the duty to report is triggered by a subjective suspicion of abuse in looking at the totality of the circumstances.

{¶ 121} After reviewing the evidence provided to this court under the applicable standards for motions for a new trial and JNOV, we find that there was evidence upon which reasonable minds could come to different conclusions on Marino's duty to report the abuse in this case. While Marino's admissions are troubling and it is difficult to see how the school officials could believe that the district took a subjective-belief approach to reporting in reviewing their own materials on the subject, much of this testimony hinges on credibility determinations, which are exclusively in the province of the trier of fact. Thus, based on

the evidence and law provided, the jury's verdict was not clearly against the weight of the evidence. Thus, we must hold that appellant's first and second assignments of error lack merit and are overruled.

{¶ 122} However, the troubling aspects of the testimony serve to highlight the prejudice to appellant caused by the erroneous jury instructions and the error in the testimony of Ms. Mercer. Based on our earlier conclusions, it is evident that the trial court erred in presenting the jury's instructions as to the law and in allowing an expert to testify about the contents of the reporting statute. When the record reflects that this matter became a battle of the evidence, both as to expert testimony and credibility, it is readily apparent that an instruction causing the jury to apply an erroneous standard and an expert who testifies incorrectly as to the substance of the law and makes ultimate conclusions as to fact and law can only serve to prejudice appellant. Accordingly, the errors necessitate a new trial in this matter.

{¶ 123} Appellees' sole assignment of error in its cross-appeal asserts:

{¶ 124} "The trial court erred in failing to direct a verdict on the general negligence claims against appellee/cross-appellant."

{¶ 125} Appellees argue that the trial court erred in allowing appellant to present his claims based on common-law negligence to the jury since the public-duty rule/special-relationship theory of liability was abrogated by R.C. 2744.02.

{¶ 126} In *Sawicki v. Ottawa Hills* (1988), 37 Ohio St.3d 222, 525 N.E.2d 468, the Ohio Supreme Court addressed the public-duty rule as it relates to political subdivision immunity and its special-duty exception. Quoting an earlier source, the *Sawicki* court explained:

{¶ 127} " '[I]f the duty which the * * * [law] imposes upon * * * [a public official] is a duty to the public, [then] a failure to perform it, or an inadequate or erroneous performance, must be a public, not an individual injury, and must be redressed, if at all, in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it, or to perform it properly, is an individual wrong, and may support an individual action for damages.' " Id. at 230, 525 N.E.2d 468, quoting 2 Cooley, Law of Torts (4th Ed.1932), 385–386, Sect. 300.

{¶ 128} The existence of a special relationship merely establishes a duty. Thereafter, a plaintiff must still establish the remaining negligence elements, i.e., breach of that duty, and a resulting injury proximately caused by the breach. Id. at 230, 525 N.E.2d 468. *Sawicki* adopted four elements needed to demonstrate a special duty or relationship:

{¶ 129} "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." Id. at paragraph four of the syllabus.

{¶ 130} Appellees direct this court's attention to several decisions in support of its contention that R.C. Chapter 2744 abrogated the special-relationship exception. In *Sudnik v. Crimi* (1997), 117 Ohio App.3d 394, 397, 690 N.E.2d 925, the Eighth District Court of Appeals noted that "[t]he public duty rule as it applies to municipalities, however, has been superseded by the enactment of the Political Subdivision Tort Liability Act, codified at R.C. Chapter 2744 *et seq.*"

{¶ 131} The Tenth District Court of Appeals in *Franklin v. Columbus* (1998), 130 Ohio App.3d 53, 59–60, 719 N.E.2d 592, noted that R.C. 2744.01 et seq. became effective November 20, 1985, and that it provides its own framework for analyzing liability of political subdivisions. Thus, "[g]iven the all-encompassing nature of the Act, this court has consistently and repeatedly held that its passage abrogated the common-law public duty rule and its corresponding special duty exception in the context of political subdivision liability." Id. at 59, 719 N.E.2d 592.

{¶ 132} In *Amborski v. Toledo* (1990), 67 Ohio App.3d 47, 51, 585 N.E.2d 974, the Sixth District Court of Appeals stated, "Our analysis of R.C. 2744.02 indicates that the intent of the statute was to codify the concept of sovereign immunity and, therefore, to abrogate the public duty/special duty theory of municipal liability."

{¶ 133} Further, in *Barr v. Freed* (1997), 117 Ohio App.3d 228, 235, 690 N.E.2d 97, this court concluded that "the adoption of R.C. Chapter 2744 abrogated the special-relationship theory of liability."

{¶ 134} Regardless, appellant directs our attention to the 2004 Ohio Supreme Court decision in *Yates v. Mansfield*, 102 Ohio St.3d 205, 2004-Ohio-2491, 808 N.E.2d 861. In discussing whether the duty to report the abuse of one child can create a duty toward a subsequent victim of abuse by the same individual, *Yates* referred to the public-duty doctrine. It concluded that the public-duty doctrine cannot be used as a defense for an agency's failure to comply with its statutory obligations. Id. at ¶ 32, citing *Brodie v. Summit Cty. Children Serv. Bd.* (1990), 51 Ohio St.3d 112, 554 N.E.2d 1301, paragraph two of the syllabus. In a footnote to that same paragraph, the Supreme Court in *Yates* explained the following:

{¶ 135} "*Brodie* * * * arose out of events that occurred during that twilight period in the early 1980s when the doctrine of municipal immunity had been

judicially abolished, R.C. Chapter 2744 * * * was not yet effective, and the public-duty rule was clearly viable. Since then, we have held that while political subdivisions may be held liable for failure to comply with the reporting requirements of R.C. 2151.421, they are immune from liability for failure to comply with the investigative requirements of R.C. 2151.421. * * * The court has also abolished the public-duty rule with regard to actions against the state brought pursuant to R.C. Chapter 2743, the Court of Claims Act. * * * At present, the public-duty rule remains viable as applied to actions brought against political subdivisions pursuant to Chapter 2744." Id. at fn. 2.

{¶ 136} Further, the Second District Court of Appeals has recently held that *Yates* confirmed the viability of the public-duty rule/special-relationship theory of liability in this context. *Cooke v. Montgomery Cty.*, 158 Ohio App.3d 139, 2004-Ohio-3780, 814 N.E.2d 505, ¶ 63.

{¶ 137} Based on *Yates*, we can only conclude that the Ohio Supreme Court has confirmed the viability of the public-duty rule/special-relationship exception as it applies to political subdivisions, at least in regards to R.C. 2151.421. Accordingly, appellees' cross-assignment of error lacks merit and is overruled. The trial court was correct in allowing appellant to present his claims based on negligence to the jury.

{¶ 138} In conclusion, we agree that the trial court erred in its subjective interpretation of the teacher's reporting requirement as found in R.C. 2151.421. We also hold that the trial court abused its discretion in allowing Mercer to testify about the contents and interpretation of the statute. Based on these errors and the evidence before the jury, a new trial is warranted. Accordingly, we hereby reverse the jury's verdict and remand this case to the trial court for a new trial. On remand, the trial court must limit its jury instruction to the statute itself and strictly limit Mercer's testimony should it be offered again.

Judgment reversed
and cause remanded.

VUKOVICH and READER, JJ., concur.